Mr Chief Justice Marshall
 

 delivered the opinion of the Court..
 

 This suit was brought by the plaintiffs in error in the court of the United States, for the eastern district of Louisiana, to recover a tract of land lying in that district, about thirty miles.east of the Mississippi, and in the possession Of the defendant. The plaintiffs claimed under • a grant for 40,000 arpents of land, made by the Spanish governor,, on the 2d of January 1804, to Jayme Joydra, and ratified by the king of-Spain on the 29th\of May 1804. The petition and order of survey are dated iirSeptember 1803, and the return of the. survey itself was made on the 27th of October in the same year. • The defendant excepted to the petition of .the plaintifis, alleging that it does not show a title on which
 
 *300
 
 they can,recover j ithat the territory, within which the. land claimed is situated, had been ceded,, before the grant, to France, and by France to the United States; and that the grant is void, being made by. persons who had no authority to make it. The court sustained, the exception, and dismissed the petition. The cause is brought beforfe this Court by a. writ of error.
 

 The case presents this very intricate, and at one time very interesting question : To whom did the country between the Iberville and the Perdido rightfully belong, when the title now. asserted by the plaintiffs was acquired1?
 

 This question has been repeatedly discussed with great talent and research, by the governmert of the United States and that of Spain. The United- States have perseveringly and earnestly insisted, that by the treaty of St Ildefonso, made on the 1st of October in the year 1800, Spain ceded the disputed territory as part of Louisiana to France; and that France, by the treaty of Paris, signed on the 30th of April 1803, and ratified on the 21st of October in the sáme year, ceded it to the United States. Spain has with équal perseverance and earnestness maintained, that her cession to France comprehended that territory only which was at that time denominated Louisiana, consisting of the island of New Orleans, and the country she received from France west of the Mississippi.
 

 Without tracing the tjtle of France to its origin, we may state, with confidence that at the commencement of the war of 1756, she was the undisputed, possessor of the province of Louisiana, lying on both sides the, Mississippi, and extending eastward beyond the bay of Mobile. Spain was at the same time, in possession of Florida; and it is understood that the river Perdido separated the two provinces from each other.
 

 Such was the state of possession and, title at the treaty of Paris, concluded between Great Britáin, France, and Spain, on the 10th day of February 1763. By that treaty. France ceded to Great Britain the,river and port of the Mobile, and all her possessions on the left side, of the river Mississippi, except the town of New Orleans and the island on which it
 
 *301
 
 is situated: and by the same- treaty Spain ceded Florida to Great Bri tain. The residue of Louisiana was ceded by France to Spain, in a.separate and secret treaty between those two powers. The king of Great Britain being thus the acknowledged sovereign of the whole country east of the Mississippi, except the island of New Orleans, divided his late acquisition in' the. south into two provinces, East and West Florida. The latter comprehended so much of the country ceded by France as lay south of the 31st degree pjf north latitude, and a part .of that ceded by Spain.
 

 By the treaty of peace between Great Britain and Spain, signed at Versailles on the 3d of September. 1783, Qreat Britain ceded East and West Florida to Spain: arid those provinces continued to be known and governed by those names, as long as they remained in the possession and under’ the dominion of his catholic majesty;
 

 Op the 1st of October in the. year 1800, a secret, treaty was concluded between France' and Spain at St Ildefonso, the third article of which is in these words : “ His' catholic majesty promises and engages on his part to retrocede to the French republic, six months after the full and entire execution of the conditions and stipulations relative • to his royal highness the duke of Parma, the Colony or province Of Louisianaj with the same extent that it now has irithe hands of Spain, and that it had when France possessed it, and such as it should be. after the treaties subsequently entered into between Spain and the other states;”
 

 The. treaty of the 30th of April 1803, by which the. United States acquired Louisiana, after reciting .this article, proceeds to state, that “ the first consul of the French republic doth hereby cede to the United States, in the name of the French republic, forever and in full sovereignty, the said. territory with all its rights and appurtenances as fully and in the same manner as they have been acquired by the French republic, in virtue of the above mentioned treaty concluded with his catholic majesty.” The 4 th article stipulates that “there shall be sent by. the government of France a commissary to Louisiana, to the end that he do every act necessary, as well to receive from the officers of his catholic
 
 *302
 
 majesty the said country, and its dependencies, in thp name of the French republic, if it has not been already done, as to transmit it in- the name of the* French republic to the coinmissarv or agént of the United States.”
 

 On thp 30th'of November. 1803, Peter Clement.Laussatt, colonial prefect and commissioner of the'French republic,' authorised, by full .powers dated/the- 6th of June 1803, tOTe-ceive the surrender of the.province of Louisiana, presented those;'p.owers to Don Manuel Salcedo, governor of Louisiana and West Florida, and to the marquis de Casa Calvó, com* missioners- op the part of. Spain, together with full powers to them from his catholic majesty to make the surrender. These-full powers were dated at Barcelona the 15th of October. 1802. The act of surrender declares that in virtue of these full powers, the' Spanish óommissioners, Don Manuel Salcedo and the- marquis -de- Casa. Calvo, “put from this moment the Said French commissioner, the citizen Laussatt, in possession of the colony of Louisiana and of its .dependencies, as also of the town and island of New Orleans, in the same extent which they now have, and tvhich they had in the hands of France when she ceded them to the royal-crown of Spain, and such as they should be after the treaties subsequently entered into between the states of his catholic majesty and those of other powers.”
 

 The following is an extract from the-order of the.King of Spain, referred to. by the commissioners in the- act of delivery. . “ Don Carlos, by the grace of God, &c.” “ Deeming it convenient to retrocede to the French republic the colony and-province of-Louisiana, I order you, as soon as the. present order shall be presented to you by general Victor or other officer duly authorised by the French republic, to take charge of said delivery; you will put him in possession of the colony of Louisiana and its dependencies,as also, of thé-city and island of NewOrleans,.with the same extent that it now has, that it. had in the hands of France when she ceded it to my royal crown, and such as it ought to be after the treaties which have successively taken place' between my states'and those of other powers.”
 

 Previous to the arrival of the French commissioner, the
 
 *303
 
 governor of the provinces of Louisiana and West Florida, and'the marquis de Casa Calvo, had issued their proclamation, dated'the 18th of May 1803; in which they say, “ his majesty having before, his eye's the. obligations-imposed by tlie treaties, arid desirous of avoiding any disputes that might arise* has deigned to resolve that, the delivery of the colony and island of-New Orleans,, which is to be made to the gene^ ral of division Victor, pr such other officer as may be legally authorised by the government of the.Frerich republic, shall be executed on the. samé, terms that France ceded it to his. majesty; in virtue of which, the limits of both shores of the river;St Louis.or Mississippi, shall remain as they wére irrevocably, fixed.-by the 7th article of. the definitive' treaty of'peace,' concluded at Paris the 10th of February 1763, according.to which the séttleniénts from the river Manshac or Iberville, to the line which separates the American territory from the dominions of the king, remain'in-possession of Spain and annexed tb West Florida.”
 

 On the 21st of October 1803, congress passed, an act to enablé thé president to fake possession of the territory, ceded' by France to the United States;: i'ri pursuance of which-cbm-missione.rs were appointed, to whom Monsieur Laussatt, the commissioner of the’French republic, surrendered Nevy Orleans and the province of Louisiana on the'20'th of December 1803. The surrerider was made'in general terms; but no actual possession was taken of the territory lying east of New Orleans.'. The government of the United States, however, soon- manifested the - opinion that the whole country originally held by France, and belonging to-Spain when-the treaty of St'Ildefonso was concluded* was by that treaty réJ trocéded to; France.
 

 On the 24'th of February 1804, congress passed an act for laying and collecting duties within the ceded territories, which authorised the president, whenever he should deem it expedient, to.erect the shores, &e. of the bay and-river Mobile, and of the other rivers, creeks, <fcc. emptying into the gulph of Mexico east of the said river Mobile, and west thereof to the Pascagoula inclusive, into a separate district, and to establish a port of entry and delivery therein. The
 
 *304
 
 port established in pursuance of this act. was at fort Stoddert, within the acknowledged jurisdiction óf the United States j and this circumstance appears, to. have-been offered as a sufficient answer to the subsequent remonstrances of Spain ¿gainst the measure. It must be considered, not as acting on the territory, but as indicating the American exposition of the.treaty, and exhibiting the claim its government intended to assert
 

 In the same session, on the 26th of March 1804, congress passed, an act erecting Louisiana into two territories. This act declares that the country ceded by France to the United States south of the, Mississippi territory, and south of an east and west, line, to commence on the Mississippi river at the 33d degree of north latitude and run west to the western boundary of the cession, shall constitute a territory under the name of the territory of Orleans. Now the. Mississippi territory extended to the 31st. degree of north latitude, and the country south of that territory was necessarily the country which Spain held as West Florida; but still its constituting a part of the. territory of Orleans depends ort the fact that it was a part of the Country ceded by France to the United. States. No practical application of the laws ofithe United States to this part of the .territory was attempted, nor could be made, while the country remained in the actual possession of a foreign, power.
 

 The 14th section enacts “ that all grants for lands within the territories ceded by the Flench republic to the United States by the . treaty of the 30th of April "1803, the title whereof was at the date of the treaty of St Ildefonso in the crown, government, or nation of Spain, and every act and proceeding subsequent thereto of whatsoever nature towards the obtaining any grant, title ox claim to such lands, and under whatsoever authority transacted or pretended, be, and the same are hereby declared to be; and to have been, from the beginning, null, void, and of no effect, in law or equity.” A proviso excepts the titles of actual settlers acquired before the 20th of December 1803, from the operation of this section. It tvas obviously intended. to act on all grants made by Spain, after her retrocession óf Louisiana to France, and
 
 *305
 
 without deciding on the extent of that retrocession, to put' the titles:which might.be thus acquired throug’nthe ’’hole territory, whatever might be its extent, completely lino.. the control of the American government:
 

 The president was-a'uthorised ’to appoint registers or recorders of. lands‘acquired under , the Spanish and French governments; and boards of commissioners who should re-, ceive all claims to lands, and hear and determine in a surfi-mtfry way all matters respecting such claims. Their proceedings were to be reported to the secretary of the. treasury., to be laid before congress for the final decision qf that body.
 

 Previous to th'e-acquisitioñ of Louisiana, the ministers of the United States had been instructed to endeavour tó ob- . tain the Floridas from. Spain. ' After that acquisition, this object was still pursued, arid-the friendly aid of the French government towards its attainment was requested. . On the suggestion of Mr Talleyrand that the time was unfavourable,. the design was suspended. The government of the United' States however soon resumed its purpose; and the settlement of the boundaries of Louisiana was blended with the purchase of the Floridas, and .the adjustment of heavy claims made by the United States for American property, condemned in the ports'of Spain during the war which was terminated by the treaty of Amiens.
 

 On his way to Madrid, Mr Monroe, who was empowered in conjunction with Mr Pinckney, the American minister at the court of his catholic majesty, to conduct the negotiation, passed through Paris; and addressed a letter to the. minister of exterior relations, in which he detailed the objects of his mission, and his views respecting the boundaries of Louisiana. In his answer to this lefter, dated the 21st of December 1S04, Mr Talleyrand declared, in decided terms, that by the treaty of St Ildefonso, Spain retroceded to France n6 part of the territory east of the Iberville which had been held and known as West Florida; and that in all the negotiations between the two governments, Spain-had constantly refused to cede any part of . the Floridas, even from the Mississippi to the Mobile. Fie added that he was authorized by his imperial majesty to say, that at the be
 
 *306
 
 ginning of the year. 1802, general Bournonville had been charged to open a new negotiation with Spain for the .acquisition .of'the Floridas; but-this project had not .been 'followed by a treaty.
 

 • Had France and Spain agreed úpon the boundaries of the retroceded territory before Louisiana was acquired by the United States,’that agreement would undoubtedly have ascertained its limits. But the declarations of France made after parting with the province-cannot be admitted as conclusive. In questions of this, character, political considerations have too much influence over the conduct of nations» to permit their declarations to decide the-course of an independent government in a matter vitally interesting to itself.
 

 ■ Soon after the arrival of Mr Monroe at his place of destination, the negotiations commenced at Aranjúez. Every word in that article- of the treaty of St Ildefonso which ceded Louisiana to France, was scanned by the ministers on both sides with all, the critical acumeii. which talents and zeal could bring into their service. Every argument drawn from collateral circumstances, connected vyith the subject, which could be supposed to elucidate it, was exhausted. No. advance towards an arrangement was made, and the{ negotiation terminated, leaving each party firm in his original opinion and purpose. Each persevered in maintaining the construction with which he had commenced. ’The.discussion. has since been resumed between the two nations with ás much ability and with as little success. The question has been again argued at this bar, with the same talent and research which it has uniformly called forth. Every topic which relates to it has been completely exhausted; and the Court by reasoning on the subject could'only repeat, what is familiar to all.
 

 We shall say only, that the language of the article may admit of either construction, and it is scarcely possible to consider'the arguments on either side, without believing that they proceed from a conviction of their truth. The phrase on which the controversy mainly depends, that Spain. retrocedes Louisiana with'the same extent that it had when France possessed it, might so readily have been expressed
 
 *307
 
 in plain language, that it is difficult to resist the persuasion that the ambiguity was intentional. Had Louisiana been retroceded with the same extent that it .had when France ceded it to Spain, or with the same extent that it had'before the cession of any part of it to England, no controversy respecting its limits could have arisen. Had the parties concurred in their intention, a plain mode of expressing that intention would have presented itself to .them. But Spain has always manifested infinite repugnance to the surrender of territory, and was probably unwilling to give back more than she had received. . The introduction of ambiguous phrases into the treaty, which power might afterwards, construe according to circumstances, was a measure which the strong and the politic .might not. be disinclined to employ-
 

 However this may be, it is, we think, incontestable, that the American construction of the article, if not entirely free from question, is supported by arguments of great strength . which cannot be easily confuted. ,
 

 In a controversy between two nations concerning national boundary, it is scarcely possible that the courts of. either should refuse to abid.e by. the measures adopted by its own government. There being no common tribunal to decide between them, each determines for itself on its own rights, and if they cannot adjust their differences* peaceably* the right remains with the strongest.. The judiciary is not that department of the government, to which the assertion of its interests against foreign powers is ..confided; and its duty commonly is to decide upon individual rights, according to those principles which the political departments.of . the nation have established. If the course of the nation has been a plain one, its courts would hesitate to pronounce it erroneous.
 

 We think then, however individual judges might construe the treaty of St Ildefonso, it is the province of the Court to conform its decisions to the will of the legislature, if that will has .been clearly expressed.
 

 The convulsed state of European Spain affected her influence over her colonies; and a' degree of disorder prevailed
 
 *308
 
 in the 'Floridas, at which the' United States could not look. with indifference. In October 1S10, the president issued his proclamation, directing the governor Of the Orleans ter-' ritory to take possession of the country as far east as. the Perdido, and to hold it for the United States: This measure was avowedly intended as an assertion of the’ title of the United States ; but as an. assertion, which was rendered necessary in order to avoid evils which might contravene thé wishes of both parties, and which wóuld still leave the terri-. tory. “ a subject of fair and friendly negotiation and ,adjustment;”
 

 In April 1812, .congress passed “■an act to enlarge the limits of the state of Louisiana.” This act describes lines .which comprehend the land in controversy, .and declares that, the .country included within them shall becpme and form a part of the state of Louisiana:
 

 In May of the same year', another act was. passed, annexing the -residue of the country, west of-the Perdido to the .Mississippi territory.
 

 . And in February 1813, the president was. authorized “ to occupy and hold all that tract of country called West Florida, which dies west of the river Perdidoj not now'in possession of the United States.”
 

 On the third of March 1817, congress erected that.part of Florida which had been annexed to the Mississippi territory, into a. separate territory, calléd Alabama..
 

 The powers of government were extended to, ana exercised in those parts of West Florida which composed a part of Louisiana and Mississippi, respectively; and a separate government was erected in Alabama.,
 
 U. S. L. c. 4.
 
 409.
 

 In.March 1819, “congress passed an act to enable the people of Alabama to form a constitution and Mate govern1 ment.” . And in December 1819, she was admitted into the union, and declared one of the United -States of America. The treaty of amity, settlement, and limits, between the United JStates and Spain, .was signed at Washington on the 22d day of February 1819, but was not ratified by Spain till the 24th day of October 1820; nor by the United States,; untik.the 22d,day of February 1821: So that Alabama was
 
 *309
 
 admitted into the union as an independent state, in virtue of, the title acquired by the United States "to her territory under the treaty of April 1S03.
 

 After these acts of sovereign power over the territory' in dispute, asserting the American construction of the treaty . by which the government claims it, to maintain the opposite construction in its own courts would certainly be an anopialy in the history and practice of natjohs. If those departments which are entrusted with the foreign intercourse of the nation, which assert and maintain its interests against foreign powers, have unequivocally asserted its rights of dominion overa country of which, it is in possession,-and which it claims under a treaty; if the legislature has acted on the' construction thus asserted, it is not in .its ówn coúrts ibat this construction is to be denied. A question like this respecting the boundaries of nations, is, as has been truly said, more a political than a legal question ; and in its discussion, the courts of every country must respect the pronounced will' of the legislature. Had this suit been instituted immediately after the passage of the act for extending the bounds óf Louisiana, could the Spanish constructibn of the treaty of Si Ildefonso have been maintained 9 Could the plaintiff have insisted that the land.did not lie in Louisiana, but in West Florida; that the occupation of the country by the United States was wrongful; and that histitle under a Spanish grant must prevail, because the acts of congress on the subject. were founded on a misconstruction, of thé treaty 9 If it be said, that this statement does not present the question fairly; because a plaintiff admits the authority of the Court, let thé parties be changed. If the Spanish grantee had obtained possession so as to be the defendant, would .a Court of the United States maintain-hi's title under .a Spanish grant, made subsequent to the acquisition of Louisiana, singly on the principle that the Spanish construction of the treaty of St1 Ildefonso was -right; and the American construction wrong9, Such a decision would, we think, have subverted, those principles which govern the relations between the lé-gislátive and judicial departments, and ,márk the limits of each.
 

 
 *310
 
 If the rights of the parties are in any degree changed, that change must.be produced by the subsequent arrangements made .between the two governments.
 

 Atreaty of amity, settlement, and limits, between the United States ,o.f America and the king of Spain,” was sign-* ed at Washington on the 22d day of February. 1819. By, the 2d. article “ his catholic majesty cedes to the United States in full property and sovereignty, all the territories which belong to him, situated tp the eastward'of the Mississippi,, known by the name of East and West Florida.”
 

 .The 8th article stipulates, that
 
 “
 
 all. the grants of land made before the 24th of January 1818 by his catholic majesty, or by hjs lawful authorities, in the said territories ceded by Lis majesty to the' United States,, shall be ratified and confirmed to the persons in possession of the lands, to the same extent'that the sapie. grants-would be valid if the territories had remained under the dominion of his catholio majesty.”
 

 The Court will not attempt to conceal the difficulty which is created by these articles.
 

 It is well known that Spain had uniformly maintriined.her construction of the treaty of St Ildefonso. — His cátholic majesty had perseveringly insisted! that no. part of West Florida had been ceded by that treaty, arid that the whole couritry.which had been known by that naine still belonged to him. It is t.hen. a fair inference from the language of the treaty, that he did not mean to retrace ..his. steps, and,relin-qui'sh his pretensions; but to cede on a sufficient consideration all that he had claimed as his; and consequently, by .the 8th article, to stipulate for the confirmation of all those grants which he had made while the title remained in him.
 

 But the Uriited States had uniformly denied the title set rip by the crown of Spain; had insisted that a párt of West Florida had been transferred to. France by the treaty of St Ildefonso, and ceded. toThe United States by the- treaty of April 1803 ; had asserted this construction by taking ¿ritual possession of the country;.and h.ad extended its'legislation* river it. . The United, States therefore cannot be understood to have admitted that this country-belonged to his catholic
 
 *311
 
 majesty, or that .it passed from him to them by this article. Had his catholic majesty cedéd to the United: States “ all the territories situated to the eastward of; the. Mississippi .known by the name of East arid West Florida,” omitting the words “which belong to him,” the United States in receiving this cession,, might have sanctioned the right to make it, and might have been bound .to consider the. 8th article as co-éxtensive with the second. The, stipulation of the 8th article might, have been construed té be ah. admission that West Florida to its full extent whs ceded by this treaty.
 

 But the insertion of these words materially affects the. construction of the article* They cannot be rejected as surplusage.' They have a plain meaning, and that meaning can be no other than to limit the'extent of the cession. We cannot Shy they were inserted carelessly or. unadvisedly, an'd mtisf understand them according to tfieir Obvious import.
 

 It is not improbable that terms were selected which might not compromise the dignity of either governrhent, and which each might understand, consistently with its former pretensions., But if a court oflhe United States would, havé been bound, ünder the state of things existing at the signature of the treaty, to consider the territory then composing a part of the state ef Louisiana as - rightfully belonging ip the, United States, it .would be difficult to construe this, article into afr admission that it belonged rightfully to his catholic majesty. .
 

 The 6th article of the treaty may.be-considered .in con-nexion with the second. rThe 6th stipulates “ that the in-, habitants of the territories which his catholic majesty codes to the United States by this treaty, shall be incorporated.in the'union of the United States, as soon as may be consistent with the principles of the federal constitution.”
 

 This article, according to its obvious import, extefrdsHo the whole; territory which was ceded. The stipulation *fo¡ . the incorporation of the inhabitants of the ceded territory into, the union, is co-extensive with the cession. But .the. country in which the land in controversy lies, .was already incorporated into the union. It composed .a part of the
 
 *312
 
 s,táte of Louisiana, which, was already a mémber of the American confederacy.
 

 A part of West Florida.lay east of the Perdido: and to thiat the right of His catholic majesty was acknowledged. There was. then an ample subject on which the words of the cession might operate, without discarding those which limit 'its general expressions.
 

 Such is ..the construction which the Court would,put on the' treaties by which the United States have acquired the country east of New Orleans. But an explanation of the 8th article seems to have been given by the parties which may vary this construction.
 

 It was discovered that three large grants, which had been supposed at the, signature of the treaty to have been made subsequent to the 24th of January 1818, bore, a date anterior to that period. .Considering these grants as fraudulent, the United States insisted on an express .declaration annulling them. This demand was resisted by Spain; and the ratification of the treaty was for some time suspended. At 'l.ength his catholic majesty yielded, and the-following clause was introduced into his ratification: “desirous at the same time, of avoiding any doubt or ambiguity concerning, the meaning of the 8th'article-of the treaty, in respect to the date which is pointed out in it as the.period for the’confir-matiort of the. grants of lands in the Floridas made by me, or. bytne competent authorities in my royal name, which point,of date was fixed in the positive understanding of the three .grants of land made in favour of .the djihe of Alagon, the count of Punon Rostro, and Don Pedro de Vargas, being annulled by its tenor; I;think it proper to declare, that the said three, grants have remained and do remain entirely annulled and invalid; and..that neither the three\i.ndividuals mentioned, nor those who'may have" title or interest through them, can avail themselves qf the said grants at any time or in'any. manner; under which explicit declaration, the said 8th article is to be ■ understood, as- ratified.” One of these grants, that to Vargas, lies west‘qf the. Perdido.
 

 It has been arguéd, and with.grgat,forcé-, thaCthis explanation forms a part of the article.. ; it may be considered
 
 *313
 
 as if introduced into it as h-proviso or exception' to.'the stipulation, in favour of grants anterior, to the 24th-of January 1818. The article may be Understood asif.it had been written, that “ all the, grants of- land made before the 24th of January 1818, by. his catholic majesty or his lawfulau-thorities in the said territories, ceded by his majesty to the United States, (except those made to the duke of Alagon, the count of Punon Rostro' and Don. Pedro de Vargas,) shall be ratified and confirmed, &c.”
 

 Had this been the form of the original article, it’would be' difficult to resist the construction that the -excepted, grants were withdrawn from it by the exception, and would otherwise have bees within its provisions. .Consequently,, that.all other fair grants within the trine- specified, were, as obligatory on the United States, as on his catholic majesty..
 

 One other judge and myself are inclined to. adopt this opinion. The majority of the Court' however think differently. They suppose that these three large grants being made about the same time,, under circumstances strongly indicative, of unfairness, knd two of them lying east of,.the Perdido, might be objected to on the ground of fraiid common to them all: without implying any opinion’ that one of them-, which .was for" lands lying within the United States, and most ;probábly in part sold by the government,"could have been otherwise confirmed. The government might. well insist on closing all., future controversy.relating to these grants, which might so- materially interfere with its own rights and policy in its future disposition of the ceded lands; and riot allow them to bécome the subject of judicial investigation ; while other grants, though deemed by it to be invalid, might be left to the ordinary course of the law. The form of the ratification ought not, in' their opinion, to change the natural'construction of the words of the 8th article, or extend themto embrace grants not otherwise.intended to be confirmed by.it. An, extreme solicitude to provide against injury or inconvenience, from the known existence of such large grants, by insisting, upon a declaration of their absolute nullity, can in their opinion furnish rio satisfactory, proof that the government meant to Tecognise
 
 *314
 
 the small grants as Valid* which in every previous act and struggle it had proclaimed to be void, as being for lands Within the American, territory.
 

 Whatever difference may exist respecting the effect of the ratification in whatever sense it may be understood, we think the sound .construction of the eighth article will not enable this Court to apply its provisions tpjhe present case. The words of the article are, that. “ all ,thé grants of laúd made before the. 24th, of January 1818,; by his catholic majesty, &c. shall bé ratified and .confirmed to thje persons Jin possession of the lands,-to. the same extent that, the same grants, would be valid if the territories had remained under the dominion of his catholic majesty.” Do these words, act directly on,, the grants, so as to give - validity to those'not otherwise valid; or do they pledge the faith of the United States to pass acts which shall ratify and confirm them!?
 

 . A treaty is. in its nature-a contract between , two nations, not a legislative act. It does n'qt: generally effect,, of itself, the object to be accomplished, especially so far as its operation is infra-territorial;. bu.t; is carried-into execution by the sovereign power of the respective parties to the instrument.
 

 In-the United .{States a,different principle, is established; Our constitution declares a treaty to be the law of the land.. It is, consequently, .to. be regarded in courts of justice as -equivalent to, ah qct .of the législature, whenever it operates of itself without the. aid of any legislative provision. But When the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to. the political, not the judicial/de-. partment; and the legislature must execute the contract before it can. become a rule for the Court.
 

 The article under.consideration does not declare that all the.grants made.by his catholic majesty, before the 24th of Januar.y. l8f'8, shall . be valid to the .same extent-as if the ceded territories had remained under his dominion. It does pot say'that those grants are hereby confirmed. Had such been its language, it would have’ acted directly on the. subject, and would have repealed those adts of congress which
 
 *315
 
 were repugnant to itj but its language is that those grants' shall be ratified and confirmed to thfe .persons'in possession, &e. By whom shall they be ratified and confirmed?; This seems to be the language of contract; and ifut is, the ratification-and confirmation which are promised must be the act of the. legislature. Until such act shall be passed, the Court is not at liberty to disregard the existing laws on the subject. Congress appears to have understood ..this article as it is understood by the Court. Boards of commissioners, have been appointed for East and'West Florida, to receive claims for lands ; and on their reports: titles to lands not ex-' ceeding. acres have'been confirmed, and to.a very large amount. .On the 23d of May ÍS28, an act was, passed supplementary to the several acts providing for -the settlement and confirmation óf private land claims in Florida; the 6th section of which. enacts, that ¿11 claims' to land within the territory of Florida, embraced by the treaty between Spain and the United States , of the 22d of February 1819,. which shall not be decided and finally settled under the foregoing... provisions of this act, containing a. greatét quantity of land than the commissioners were authorized to decide, and which have not been reported as antedated or forged, &c., shall be received and adjudicáted by the judge of the superior court of the district within which the" land lies, upon the petition* of the claimant,”&c. Provided, that nothing in this section shall be construed to enable the judges to take cognizance of any'claim annulled by the said treaty,, or thé deeree ratifying the same by the king, of Spain,.nor any.claim not presented to the commissioners or register and receiver. Art appeal is allowed from the decision of the judge of the district to this.Court. No such act of confirmation has been extended to grants for land', lying west of the Perdido.
 

 The act of 1804, erecting Louisiana into two territories, has been already mentioned. It annuls all grants for lands in the ceded territories, t'he title whereof was át the date of the treaty of St Ildefonso in the crown of Spain. The grant in- controversy is not. brought within any of the exceptions from the enacting clause.
 

 
 *316
 
 . “The legislature has passed many subsequent acts previous to the treaty of 1819, the object of which was to adjust the titles to lands in the country acquired by the treaty of 1803;
 

 They cautiously confirm to residents all' incomplete titles to lands, for Which a warrant or order of survey had been obtained previous to the 1st of October 18Ó0. '
 

 An act, passed in April 1814,' confirms incompleté titles to lands in the state of Louisiana, for which a warrant or order of survey had been granted prior to the 20th of December 1803, where the claimant or the person under whom he claims was-a resident of the province-of Louisiana on -that day, ,or at the date of the concession, warrant, or order of survey; and where the .tract does not exceed 640 acres. This act extends to, those cases' only-' which had been, reported by the board- of commiss. oners; and annexes to the confirmation several conditions, which it is unnecessary to review, because the plaintiff does not claim to come within the provisions'of "the act.
 

 On the 3d of-March 1819, congress passed an áct confirming all complete grants to land from the Spanish government, contained in the reports made by the commissioners ■appointed by the president.for the purpose of adjusting titles which had been deemed valid by the commissioners; and also fill the claims reported -as aforesaid, founded on any order, of survey, reque.te, permission-to. settle, or any written evidence of claim derived from the Spanish authorities, which ought in the opinion of the commissioners to be confirmed; and which by the said reports appear to be derived from the Spanish government before the 20th day of December 1803, and the land claimed to have been cultivated or inhabited on or. before that day.
 

 Though the order of survey in this case w;as granted before the 30th of December 1803, the plaintiff does not bring himself within this act.
 

 Subsequent acts have.passed in 1.820, 1822' and 1826, but they only confirm claims approved by the commissioners, among which the plaintiff doe's not allege his to have been placed.
 

 Congress has reserved to itself the supervision of the'titles
 
 *317
 
 reported by its commissioners, and has confirmed those which the commissioners have approved, but has passéd no law, withdrawing grants generally for lands west of the Perdido from the operation of the 14th section of the act of 1804, or repealing that section.
 

 We are of opinion then, that the court committed no error in dismissing the petition of the plaintiff, and that the judgment ought to be affirmed with costs*
 

 This cause came on, to be heard on the transcript of the récord from the district, court of the United States for the eastern district of Louisiana, and was. argued by counsel; on consideration whereof, this Court, is of opinion that the said district court committed no error in dismissing the petition of the plaintiffs; therefore, it is considered, ordered and adjudged by this Court, that the judgment of the said district court in this cause be, and the. same is hereby affirmed with costs.