The Heirs of Pollard vs. Kibbe.

THE HEIRS OF POLLARD vs. KIBBE.

1. The terms "new grant," in the act of Congress of the 26th May, 1824, entitled "an act granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals of said city," (1 vol. Land Laws, 398, ed. of 1838,) will not embrace a grant of land made by the Spanish Commandant of Mobile, in 1809.

Error to Baldwin Circuit court.

Ejectment—before *Pickens*, J.

This was an action of ejectment, brought by the plaintiffs against the defendant, to recover a lot of ground in the city of Mobile.

The plaintiffs, in order to make out their title, offered in evidence a Spanish grant, dated twelfth October, eighteen hundred and nine, made to William Pollard, the ancestor of the plaintiffs, by Cayetano Perez, of which the following is a translation:

"*Mr. Commandant*—William Pollard, an inhabitant of this District, before you with all respect represents, that as he has a mill established on his plantation, and often comes to this place with planks and property from it,—he wishes to have a place propitious or suitable for the landing and safety thereof, and having found a vacant piece at the river side, between the channel, (which is called John Forbes & Co.) and the wharf at this place, he petitions to grant him said lot on the river bank, to give more facility to his trading,—a favor he hopes to obtain of you.—Mobile, 11th Dec'r, 1809.

                                        WM. POLLARD.

The Heirs of Pollard *vs.* Kibbe.

" Mobile, 12 of Dec. 1809.—I grant the petitioner the lot or piece of ground he prays for, on the river bank, provided it be vacant. CAYETANO PEREZ."

The grant was shown to have been reported against by the commissioners appointed by the United States. The plaintiffs also proved, that in eighteen hundred and thirteen, or eighteen hundred and fourteen, the hands of William Pollard removed some wreck and drift-wood from the place where the premises in question now are.

The defendants gave in evidence, a Spanish grant to John Forbes & Co., dated ninth June, eighteen hundred and two, for a lot of ground eighty feet front on Royal street, with a depth of three hundred and four east, and bounded on the south, by Government street; which grant was recognised as a perfect title, and is confirmed by an act of Congress. This lot, as appears from a diagram which accompanies the record, extended to what is now Water street, and is due west, and immediately in front of the lot sued for in this action, which was separated from it by Water street.

It was also in proof, that previous to eighteen hundred and nineteen, and until eighteen hundred and twenty-three, the lot now sued for, was at ordinary high tide, covered with water, and nearly so, at all stages of the water. That the ordinary high water flowed from the east, to about the middle of what is now Water street, between the lot claimed by the plaintiffs, and the grant to John Forbes & Co. It was proved, that Forbes & Co. had been in possession of their lot, since eighteen hundred and two, and that it was known as a water lot, under the Spanish government.

9 P 90

The Heirs of Pollard vs. Kibbe.

In the year eighteen hundred and twenty-three, no one being then in possession, and the same being under water, one Curtis Lewis took possession of, and filled up east of Water street, and from it eighty feet east, and thirty-six or forty feet wide, filling up north of Government street, at the corner of the same and water street. That Lewis remained in possession about nine months, when he was ousted in the night by Forbes & Co., who caused to be erected a smith's shop thereon, and from whom Lewis soon afterwards recovered possession by legal process, and retained it until he conveyed the same. It was also in proof, that at the time Lewis took possession, Water street could be passed by carts, and was common. The defendant connected himself through conveyances for the premises in controversy, with the said grant to John Forbes & Co., with the said Curtis Lewis, and with the mayor and aldermen of the city of Mobile.

It was admitted, that the premises were between Church street, and North Boundary street.

The plaintiff gave in evidence, an act of Congress passed on the twenty-sixth May, eighteen hundred and twenty-four, entitled "an act granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals of said city."

Also, an act of Congress passed second July, eighteen hundred and thirty-six, entitled "an act for the relief of William Pollard's heirs, upon which a patent had issued, which was in evidence.

On this evidence, the court charged the jury, that if the lot conveyed as above to John Forbes & Co., by the

The Heirs of Pollard vs. Kibbe.

deed· aforesaid, was known as a water lot under the Spanish government, and if the lot claimed by the plaintiffs had been improved at, and previous to the twenty-sixth May, eighteen hundred and twenty-four, and was east of Water street, and immediately in front of the lot so conveyed to John Forbes & Co., then the lot claimed, passed by the act of Congress of May, eighteen hundred and twenty-four, to those at that time owning and occupying the lot, so as above conveyed to John Forbes & Co.

The court further charged the jury, it was immaterial who made the improvement on the lot on the east side of Water street, being the one in dispute; that by the said act of Congress, the proprietor of the lot on the west side of Water street, known as above, was entitled to the lot on the east side of it. To which charges of the court, the plaintiff excepted.

The charges thus given, are now assigned for error.

*Salle,* for plaintiffs in error.
*J. A. Campbell,* contra.

ORMOND, J.—The lot of land sought to be recovered in this action, is in the city of Mobile, and was a portion of the territory east of the Ibberville, or river Mauchac, and west of the Perdido.

By the treaty of St. Ildefonso, between Spain and the French Republic, entered into on the first October, eighteen hundred, the former retroceded to the latter, the province of Louisiana. On the thirtieth April, eighteen hundred and three, France ceded Louisiana to the United States, with all its rights and appurtenances, as fully,

and in the same manner as they were acquired by the
French Republic, in virtue of the treaty between France
and Spain, before mentioned.

At the date of said treaty, the boundary of Louisiana
on the west, was not accurately defined, and after the
acquisition of Louisiana by the United States, the govern-
ment insisted that the tract of country lying between
the Ibberville and the Perdido, and south of the thirty-
first degree of north latitude, was a part of the province
of Louisiana, ceded by Spain to France by the treaty of
St. Ildefonso, and acquired by the United States, by the
treaty of Paris. This was resisted by Spain, who re-
mained in possession of the disputed territory, and
claimed it as a part of West Florida.

The United States asserted her right to the territory in
dispute, not only by her minister's diplomatically, but
also by her laws, making void all grants of land within
its limits, except for small quantities, and to actual set-
tlers, after the date of the treaty of St. Ildefonso, and by
annexing the land in controversy to the Territory of Or-
leans.

As early as the twenty-sixth of March, eighteen hun-
dred and four, Congress passed an act, the 14th section
of which enacts, "that all grants for lands ceded by the
French Republic to the United States, by the treaty of the
thirtieth April, eighteen hundred and three, the title
whereof was, at the date of the treaty of St. Ildefonso,
in the crown, government, or nation of Spain, and every
act and proceeding subsequent thereto, of whatsoever na-
ture, towards the obtaining any grant, title or claim to
such lands, and under whatsoever authority transacted

or pretended, be, and the same are hereby declared to be, and to have been from the beginning, null and void, and of no effect in law or equity." A proviso excepts the title of actual settlers, acquired before the twentieth December, eighteen hundred and three. That no grant of land, emanating from the Spanish government after the date of the treaty of St. Ildefonso, and not protected by the proviso above recited, or some subsequent act of Congress is valid, was settled by the great case of Foster and Elam vs. Neilson, (2 Peters, 253,) and subsequently confirmed by the case of Guicar vs. Lee, (12 Peters' R.)

The grant upon which the plaintiffs seek a recovery, bears date the twelfth December, eighteen hundred and nine, and was reported against by the board of commissioners, appointed to investigate titles in the disputed territory, for want of inhabitation and cultivation, and therefore, not confirmed by Congress, and of itself no evidence of title. But it is insisted by the plaintiffs, that an act passed by Congress, the twenty-sixth May, eighteen hundred and twenty-four, confirms and makes valid this grant. The 2d section, which is alone material to this question, is in these words: " and be it further enacted, that all title and claim of the United States, to so many of the lots of ground east of Water street, and between Church street and North Boundary street, now known as water lots, as are situated between the channel of the river, and the front of the lots known under the Spanish government as water lots, in the said city of Mobile, whereon improvements have been made, be, and the same are hereby vested in the several proprietors and occupants of each of the lots heretofore fronting on the

river Mobile—except in cases where such proprietor or occupant has aliened his right to any such lot now designated as a water lot, or the Spanish government has made a new grant or order of survey for the same, during the time at which they had the power to grant the same; in which case, the right and claim of the United States shall be, and is hereby vested in the person to whom such alienation, grant, or order of survey was made, or in his representatives; provided, that nothing in this act contained, shall be construed to affect the claim or claims (if any such there be) of any individual or body corporate."

The plaintiffs also gave in evidence, an act of Congress, approved July twentieth, eighteen hundred and thirty-six, entitled an act for the relief of the heirs of William Pollard. "Be it enacted, &c. that there shall be, and hereby is, confirmed unto the heirs of William Pollard, deceased, a certain lot of ground situate in the city of Mobile, and bounded as follows, to wit: on the north, by what was formerly known as John Fobes & Company's canal; on the west by Water street; on the south by the King's wharf, and on the east by the channel of the river—and that a patent shall issue in the usual form for the same; provided, that this act shall only operate as a relinquishment on the part of the United States, of all their right and claim to the above described lot of ground, and shall not interfere with, or affect the claim or claims of third persons." A patent issued in obedience to the said act of Congress.

To a proper understanding of the act of Congress of May, eighteen hundred and twenty-four, above cited, it

The Heirs of Pollard *vs.* Kibbe.

is necessary to state, that as Mobile was laid out, and existed under the Spanish government, Royal street was on the back, or margin of the bay, running in a line from north to south, or nearly so, the tide flowing to what is now Water street, which lies parallel to, and east of Water street, so that the eastern limits of the lots fronting on Royal street, were washed by the tide. These are the lots described in the law, as lots known under the Spanish government, as water lots. When the city came into our possession, the restless and enterprising spirit of our countrymen, caused a gradual encroachment of the city to the eastward, by filling up the bay, and subjecting it to the use of man, for the purpose of building; so that now, there are several streets east of Water street, which are all encroachments on the waters of the bay.

The act of Congress of twenty-sixth May, eighteen hundred and twenty-four, is not as precise in its terms as could have been desired—it being open to some controversy, whether the lots east of Water street, which were made by filling up the margin of the river Mobile, were intended to be given to the "proprietor" of the lot fronting such water lot on the west side of Water street, or to the "occupant" of the improved lot on the east side of Water street; but both of these classes of persons were postponed to the Spanish grantee, who (in the language of the act,) had obtained a "new grant or order of survey for the same from the Spanish government, during the time at which they had the power to grant the same."

The plaintiffs assert no title to the lot on the west side

of Water street, fronting the one in dispute; they must, therefore, derive their title either as improver or occupant of the lot on the east side, or by virtue of the grant made in eighteen hundred and nine; and it is insisted, that the term "new grant," as used in the act of eighteen hundred and twenty-four, was designed to confer on such grants as the one now under consideration, a capacity to be the source of title.

In support of this proposition, it is strenuously contended by the counsel for the plaintiffs, that such a construction should be put on the act, as will, if possible, give effect to every word in it—that this can only be done, by supposing that the word *new* found in the law, coupled with Spanish grants, must have reference to some epoch connected with the subject matter. That grants made before that period, were by Congress considered *old* grants—those made after, *new* grants, and this epoch, he supposes was the date of the treaty of St. Ildefonso—the first October, eighteen hundred.

The rule itself, and the propriety of its application, when possible, is distinctly admitted; but it is most obvious, that the date selected as the epoch from which the grant is to be considered *new*, is purely arbitrary. There is nothing in the law, which authorises the selection of that in preference to any other date or period of time which might be supposed. Sensible of this, the counsel has drawn his arguments in support of his theory, from the history of the country, and from the mass of laws passed by Congress on this subject.

It is certainly a correct mode of expounding a doubtful statute, to compare it with other acts in *pari materia,*

and to construe it in reference to the object in view, giving effect, if possible, to every part of it. This we have done; and the process has satisfied us, that the proposition of the plaintiffs' counsel is untenable.

Ever since the acquisition of Louisiana, in eighteen hundred and three, the United States, through all the departments of the government, have perseveringly maintained, that by the treaty of St. Ildefonso, Spain ceded to France, the territory between the Ibberville and Perdido, south of the thirty-first degree of north latitude; and that all grants made by the Spanish government, for land within the territory of Louisiana, after the date of the treaty of St. Ildefonso, are absolutely void. As early as eighteen hundred and four, by the law already referred to, this principle was asserted by Congress, the only exception being in favor of actual settlers, and for a limited quantity of land. No subsequent law of Congress, (though many have been passed on the subject,) has changed this principle, unless it has been done in this instance; though in the spirit of a wise and benignant policy, ample provision has been made for the adjustment of those titles, on just and equitable principles.

What reason, then, can be assigned for a departure from the long established policy of the country? We certainly cannot infer such abandonment from the use of an ambiguous term, to which it is difficult to assign any sensible meaning. Under the law which previously existed, if the claim of the plaintiff were meritorious, it would have been recognised—it was offered and rejected. And if it were permitted to examine the decision of the commissioners, it could not be pretended, that removing

9 P                    91

some drift-wood in eighteen hundred and thirteen, to land a boat, or for any other purpose, would bring the plaintiffs' claim within the purview of any of the acts of Congress on the subject.

As the opposite of the term "new" is *old*, there appears to be some plausibility in the supposition of the defendant's counsel, that where Congress applied the term new to Spanish grants, they had not reference to time alone, by reference to an epoch after which grants should be considered *new*, as it is inconceivable, on that hypothesis, why the date was not mentioned in the land, but that *new* grant, was put in contradistinction to an *old* grant, for the same tract of land. But this construction is open to many objections, the most obvious of which is, that the old grant would be valid under the treaty, and there could be no possible reason for legislating in favor of the new grant, if made to the same individual: still less could it be supposed, that Congress would attempt to confer the title on the subsequent grantee of the same land. It is possible, that the term "new grant," applies to a grant of the shore, or space between *high* and low water marks, there having been a previous, or *old* grant, immediately in front, bounded by high water mark. This construction receives some countenance from the fact, that the Spanish government, at least in one instance, made such a grant.

But if the act of Congress leaves us in doubt as to the meaning affixed to the term *new grant*, it at least requires such grants to have one quality, without which, they cannot be evidence of title to the lots intended to be granted. It was not only to be a "new grant," but it

The Heirs of Pollard *vs.* Kibbe.

must have been made during the time when the Spanish government had "*power*" to make it. This we understand to be nothing more than a reiteration of the principle for which the government has always contended.

The argument of the plaintiffs' counsel, that "power," as used in the law, has reference to the period of time which intervened between the date of the treaty of St. Ildefonso. and the occupation of the disputed territory by the United States. cannot be admitted. The government of the United States, as already stated, insisted on their right to the territory in dispute, and that the possession by Spain was wrongful. Such a construction would be, in effect, a concession by the United States, that her pretension to the territory in dispute, was unfounded. It would convict our government of the injustice of having taken advantage of the weakness of a foreign power, to take forcible possession of a territory to which it had no valid title. For, if "power," in the manner it is employed by Congress, means (as we must understand it to mean.) *lawful authority*, it would necessarily follow, that the claim of the United States, to the territory in dispute, was unfounded, as it is inconceivable that the Spanish government could have lawful authority to grant land which belonged to the United States. A construction which would lead to such consequences, it would not be respectful in this court to make, without the clearest evidence that such was the intention of Congress—(See the cases of Foster vs. Elam, 2 Peters, and Garcia vs. Lee, 12 Peters.)

Whatever, then, may have been the meaning of Congress, by the use of the term "new grant," in the act of

eighteen hundred and twenty-four, we cannot presume it was intended to give any sanction to grants emanating from the Spanish government, for lands within the disputed territory, after the first October, eighteen hundred, further than they had already been provided for by law.

But it is said the government intended to be bountiful, and that its acts may be liberally construed—that the government cannot be suspected of wishing to drive a "Smithfield bargain." In the adjustment of the Spanish land titles, the government has been influenced by a wise and liberal policy. Denying that the Spanish government had lawful authority to grant lands within the territory claimed by the United States, yet as Spain held possession of the country, all grants for a reasonable quantity of land to *actual settlers*, were recognised and legitimated. But mere donations of the public domain, without a consideration of a public or pecuniary nature, are not in accordance with our practice, or consonant to our institutions, and therefore, cannot be presumed. Monarchs may have favorites—Republics can have none. Upon this principle, our government has always acted, and it is preserved in the act of eighteen hundred and twenty-four. The lots of ground which Congress were disposing of, were not given capriciously, but apparently on the ground of the public benefit conferred by filling up the lots, and thus subjecting them to the purposes of man, and the uses of commerce.

It is therefore our opinion, that the grant offered in evidence by the plaintiffs, is not embraced by the terms "new grant," in the act of eighteen hundred and twenty-four, before referred to.

The act of eighteen hundred and thirty-five, is in terms a mere confirmation, but it must operate as a grant of all the interest of the United States, in the land mentioned in the act at the date of the law, such being the evident intention of the Legislature. Out of abundant criterion, doubtless the act recites that it shall only operate as a relinquishment of the title of the United States, and shall not interfere with or affect the claims of other persons. The question, then, is, had the United States previously parted with their title?—and this leads to the examination of the title of the defendant.

The defendant's title consists of conveyances for the lot of land in dispute—

1. From John Forbes & Co., who held the lot on the west side of Water street, fronting the one in controversy, by a confirmed Spanish grant, dated in eighteen hundred and two;

2. From Curtis Lewis, who entered upon the lot in dispute, and improved it by filling it up;

3. From the mayor and aldermen of the corporation of Mobile.

The title of the defendant, is also derived from the act of eighteen hundred and twenty-four, already cited. It cannot be concealed, that the meaning of the act is exceedingly obscure, and that it is difficult to determine whether, under the 2d section of the law, the lots on the east side of Water street, were intended by Congress to be granted to the improver or occupant of the lot, or whether they were granted to the proprietors and occupants of the lots fronting them on the west side of Water street. But it is not necessary to determine the mean-

ing of the law, because the defendant can protect himself in this case, in any possible construction of the law. Through Lewis, he derives title from the improver and occupant of the lot on the east side of Water street, and through John Forbes & Co., from the proprietor of the lot fronting it on the west side of Water street. The union of these two must, under any construction of the law, constitute a perfect title under the act of Congress, unless opposed by a valid Spanish grant for the same lot, in which attitude, the plaintiffs in error have not placed themselves.

It is not, therefore, necessary to consider whether the charge of the court, that the proprietor of the lot on the west side of Water street, was under the act, entitled to the lot fronting his lot on the east side of Water, whether such lot were improved by him, or by another, as the plaintiffs do not show on the record, that they have any interest in the decision of that question, and therefore, if the judgment of the court on that point were wrong, they cannot be prejudiced by the decision.

No notice has been taken of the title of the defendant, derived from the corporation of Mobile, as it is not necessary to the decision of this case, and would lead to the discussion of matters which will be necessary to be determined in other cases, now before the court.

For the same reason, no notice has been taken of the argument, in relation to the rights of riparian proprietors, on a navigable stream. In this case, both parties claim under an act of Congress, and assert a grant for the lot in dispute, and neither are in a situation to contest the right of Congress to legislate on the subject. Let the judgment of the court below be affirmed.