### TARTAR CHEMICAL CO. v. UNITED STATES.

(Circuit Court, S. D. New York. June 27, 1902.)

1. **CUSTOMS DUTIES—EFFECT AND SCOPE OF RECIPROCITY AGREEMENT—QUESTION FOR THE COURTS.**

   Whether the territory from which goods are imported into the United States is an integral part of a foreign country with which the United States has a reciprocal trade agreement, so that the importation is governed by the provisions of such agreement, or a colony to which the agreement does not apply, is a judicial question for the courts, and not a political one upon which the determination of an executive department of the government is conclusive.

2. **SAME—FRENCH TREATY—IMPORTATIONS FROM ALGERIA.**

   The question whether Algeria is a part of France and within the scope of the president's proclamation of May 30, 1898, putting in force a reciprocal commercial agreement between France and the United States, as authorized by section 5 of the tariff act of 1897, or is merely a colony, and not affected by such agreement, is one which must be determined solely by the laws of France, and when the French minister of foreign affairs and the diplomatic and consular representatives of that country in the United States unite in stating that since the decree of October, 1870, abolishing the colonial government of Algeria, dividing it into

departments, and adding them to the departments of European France, it has been an integral part of the republic of France, their statement should be accepted as conclusive by a court of this country in the administration of its customs laws, and in giving effect to the agreement between the two nations, entered into in a spirit of amity, with desire to improve their commercial relations.

## Appeal by Importer from a Decision of the Board of United States General Appraisers.

The merchandise in question consists of crude tartar, the product of Algeria, exported from Marseilles, France. It was assessed for duty at the rate of 1½ cents per pound, under the provision of paragraph 6 of the act of 1897, for "argols or crude tartar or wine lees crude." It is claimed by the importer to be dutiable at only 5 per centum ad valorem by virtue of the provisions of the president's proclamation of May 30, 1898 (30 Stat. 1774), issued under authority of section 5 of said act providing for reciprocal commercial relations between the United States and France. It is insisted by the importer that Algeria is a part of France within the meaning of the proclamation referred to. The only question involved is whether Algeria is a part of the French republic. The board found that it is not a part of France, but is simply a French colony. It appears that on the 24th of October, 1870, a decree relative to the political organization of Algeria, was promulgated by the government of the national defense. This law is still in force. Articles 1 and 2 suppress the existing colonial government of Algeria and abolish the prior decrees relating thereto. Article 3 is as follows: "Algeria shall consist of three departments: A department of Alger and departments of Oran and Constantine, which thus establishes in the French republic 92 departments. Each department shall name two representatives of the people." Article 7 provides that "each department shall be administered by a prefix who shall exercise, under the higher authority of the civil governor general the functions conferred on the prefix of the departments of the republic." The record contains a letter written by M. Bruwaert, French consul general at New York, in which he says: "Algeria is as much a part of France as Burgundy, Provence, Corsica Island or any other part of our country when called by its special regional name—as much as the state of New York is a part of the United States, although called by another name, as much as Long Island is a part of New York state though called by a special name. Our customs tariff and regulations apply to both those parts of France as any law in the state of Michigan applies to the Upper Peninsula on Lake Superior." There also appears a letter from M. Delcassé, minister of foreign affairs of the French republic, dated June 6, 1899, in which he says: "Algeria being administered in 'departments' as France and completely incorporated under the same customs regulations and same manner as Corsica, is not a French colony, but a continuation of our continental territory. Therefore, the decision of the collector of the port of New York is not any more justifiable than would be a decision by French authorities refusing to recognize products of any state of the United States as coming from federal territory." The French embassador at Washington, M. Cambon, entertains precisely similar views and in reply to a letter addressed to him by the counsel for the importers, dated the 15th of March, 1902, M. De Margerie, counselor of the French embassy, says: "I am directed by his excellency the French embassador to let you know that Algeria is divided into three departments (Alger—Oran—Constantine) and that these three departments are placed on the same footing as the departments of the continental France, as is also, for instance, the case for the territory of Belfort (remaining from the ancient department du Haut Rhin in Alsace). There were in 1870 89 departments in the continental France and 3 in Algeria, in all 92 departments, as says the decree of October 24, 1870, article 3. After the war of 1870, in 1871, the number of continental French departments was to be reduced to 86, which added to the 3 Algerian departments makes 89. There are no other departments except those of Algeria outside of continental France." This

testimony was received without objection and none of the facts stated is disputed. At the hearing in this court certain correspondence which passed between the department of state and the embassy of the French republic at Washington, was read, apparently without objection. From this it appears that the department of state bases its conclusions that Algeria is not a part of France upon the following premises: First: That separate tariffs have been established for France and Algeria. Second: That France is regarded as the mother country, and Algeria as a French colony for customs purposes. Third: That duties are imposed on importations from Algeria into France, and from France into Algeria. Fourth: The French government in the decree of May 28, 1898, distinguished the two countries by mentioning distinctly France and Algeria. Fifth: The larger commercial convention between the United States and France in July 24, 1899, expressly by consent of both parties named Algeria distinctly from France. There is no proof, other than the statements in said correspondence, that separate tariffs have been established for France and Algeria; this is, however, immaterial in view of the contention advanced on behalf of the government. The argument is that the question involved is political rather than judicial, and must be determined by the executive and not the judicial department. In other words, that the court is compelled to follow the conclusion reached by the department of state irrespective of the evidence and reasoning upon which that conclusion is based.

Howard T. Walden, for importer.

D. Frank Lloyd, Asst. U. S. Atty.

COXE, Circuit Judge. The only question presented by this appeal is whether or not Algeria is a part of France. The law of October, 1870, expressly abolishes the colonial government and adds the three departments of Algeria to those of European France. The French embassador, M. Cambon, the French minister of foreign affairs, M. Delcassé, the French consul general at New York, M. Bruwaert, and the counselor of the French embassy, M. De Margerie, all unite in declaring that since the law of 1870 Algeria is as much a part of the French republic as is Corsica or any of the departments of European France. They say that Algeria is as much a part of France as New York is a part of the United States or as Long Island is a part of the state of New York. It would seem that at this point controversy should end. The question is one of law arising upon undisputed facts regarding the political character of territory concededly the property of a foreign nation with whom this country is at peace. It is not a question of fact regarding a disputed boundary line between independent states of which the executive branch of the government may take cognizance. If the title to Algeria were in dispute between France and another power, of course, a very different question would be presented. That the status of French territory must be determined by the law of France seems too obvious for argument. The law incorporating Algeria into the republic of France is in evidence. It is not ambiguous and there can be little doubt as to the meaning of its provisions. The proof, however, does not end here. The law has been interpreted and explained by the statesmen, publicists and diplomats of France. Such opinions are paramount to those of encyclopedists, lexicographers and historians, even if it be assumed that they have expressed contrary opinions since the decree of October 24, 1870, went into effect. That they have done so does not appear. If the court cannot rely

upon the lawyers of France to interpret their own statutes where can it turn for information? What other guide can be followed in dealing with international problems? If the United States assumes to question the right of France to say what is the political complexion of her own territory we must concede a similar privilege regarding our own domain. Should any foreign state assert that territory, which our laws declare to be within the Union, is not the territory of this republic, would we not be justified in resenting it as an impertinent intermeddling with our domestic affairs? The commercial dealings between great nations should be carried on in a spirit of comity and with a disposition on the part of each to rely upon the honor and good faith of the other. But it is said that the provisions of certain French tariff laws are inconsistent with the proposition that the Algerian departments are a part of the republic of France. Cui bono? The provisions of a tariff act cannot expatriate a state. Can it be seriously maintained that a French customs tariff can operate to make the island of Martinique a department of the French republic or to exclude therefrom the island of Corsica or Normandy or Burgundy? States are not made and unmade by revenue laws. As before observed the tariff acts relied upon are not in evidence, but, admitting them to be as stated, how can the court assume that under the French tariff scheme a department may not be favored or discriminated against in the assessment of duties? There is nothing in the record to show what is the organic law of France upon this subject. There is no basis for the assumption that it is the same as our own. Such a law as is said to exist between France and Algeria might be held unconstitutional here, but is this so in France? In the absence of proof the court must assume the contrary. Indeed the court may almost take judicial notice that the French revenue policy is not uniform and is totally different from our own. There is nothing in this country which at all approximates the French octroi, which is a duty levied at the gates of French towns upon goods seeking to enter. One-tenth goes to the national treasury and the remainder towards local expenses. Octroi officers are permitted to search all travelers and individuals entering a town. Every American who has visited the French capital has probably been amazed and annoyed at the activity of these officers. The French government derives a large revenue from the octroi of Paris.

Again, it is argued that this is not a judicial but a political question; that because the executive officers of the government have expressed an opinion regarding it, the courts are bound by that opinion no matter how much they may differ with its reasoning. Even if this were a subject upon which the executive departments would have jurisdiction, if the subject were properly presented to them, it is not at all certain that jurisdiction can be invoked in the informal way disclosed by this record. The opinions expressed were, as the court recalls the correspondence, in the line of comity rather than the result of a controversy which demanded action on the part of the executive officers of the government. But, however this may be, the court is clearly of the opinion that this is a ques-

tion for the courts. Under section 14 of the customs administrative act jurisdiction is vested in the board of general appraisers to examine and decide each controversy submitted to it for decision. Section 15 gives the court jurisdiction on appeal to "proceed to hear and determine the questions of law and fact involved in such decision respecting the classification of such merchandise and the rate of duty imposed thereon." 26 Stat. 137, 138.

The authorities cited by the district attorney do not seem to be relevant to the present controversy. In Foster v. Neilson, 2 Pet. 253, 7 L. Ed. 415, the controversy related to territory in dispute between the United States and Spain. Chief Justice Marshall said:

"In a controversy between two nations concerning national boundary, it is scarcely possible that the courts of either should refuse to abide by the measures adopted by its own government. There being no common tribunal to decide between them, each determines for itself on its own rights, and if they cannot adjust their differences peaceably, the right remains with the strongest. The judiciary is not that department of the government to which the assertion of its interests against foreign powers is confided; and its duty, commonly, is to decide upon individual rights according to those principles which the political departments of the nation have established. If the course of the nation has been a plain one, its courts would hesitate to pronounce it erroneous."

In Jones v. U. S., 137 U. S. 202, 11 Sup. Ct. 80, 34 L. Ed. 691, the plaintiff in error was indicted for murder committed at Navassa Island in the Caribbean Sea. The question debated was whether Navassa was under the sole and exclusive jurisdiction of the United States, and the court, after an examination of the act of congress relating to the discovery of guano islands and the determination of the president thereunder, decided that the courts of the United States could take cognizance of a crime committed there. Mr. Justice Gray says:

"Who is the sovereign, de jure or de facto, of a territory is not a judicial, but a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens and subjects of that government."

In other words, the court, inferentially at least, seems to recognize the right of the legislative and executive departments of France to regulate and declare the political status of territory over which the republic exercises undisputed ownership and dominion.

In Williams v. Insurance Co., 13 Pet. 415, 10 L. Ed. 226, it appeared that there was a dispute between the United States and Buenos Ayres regarding the jurisdiction of the Falkland Islands, and the president, in a message to congress and in correspondence with that country, having denied the jurisdiction of Buenos Ayres, the court declined to consider the question of fact presented, holding that the president's action was not the subject of judicial investigation.

A mere statement of the facts in these cases sufficiently emphasizes the wide difference between them and the case at bar.

The decision of the board is reversed.