## STATE v. HOSEA DOVE.[1]

April 24, 1931.

No. 28,364.

*George B. Sjoselius,* for appellant.

*Henry N. Benson,* Attorney General, and *H. B. Sherwood,* Assistant Attorney General, for the state.

HOLT, J.

Defendant was convicted of illegal fishing in the waters of Black Bay of Rainy Lake embraced within the territory of Koochiching county. He was fishing with gill nets, set some 2,500 feet south of the boundary line established through Rainy Lake by the joint action of the governments of the United States and Canada. He appeals from the order denying a new trial.

Defendant's contention is that by the Webster-Ashburton treaty and the Root-Bryce treaty jurisdiction as to fishing in the waters of Rainy Lake lying within the territory of this state is withdrawn from the state and rests now with the international fisheries commission. Therefore the order No. 48, made pursuant to G. S. 1923, § 5630, as amended, 1 Mason, 1927, id. by the state game and fish commissioner, for the violation of which defendant was convicted, is null and void because it relates to waters withdrawn from the

[1]Reported in 236 N. W. 322.

jurisdiction of the state so far as concerns taking fish therefrom. No claim is made for a new trial upon any other ground than that state jurdisdiction over fishing in the Minnesota waters in Black Bay of Rainy Lake has been withdrawn from the state by the treaties referred to.

The only provision of the Webster-Ashburton treaty [8 St. 572] relied on is found in article II and reads:

"It being understood that all the water communications and all the usual portages along the line from Lake Superior to the Lake of the Woods, and also Grand Portage, from the shore of Lake Superior to Pigeon river, as now actually used, shall be free and open to the use of the citizens and subjects of both countries."

It is clear that the use here spoken of is for travel and does not relate to the regulation of fishing in the waters referred to.

The Root-Bryce treaty of 1908, 35 St. 2000, was for the express purpose of regulating the fishing in international or border waters. Art. I reads:

"The times, seasons, and methods of fishing in the waters contiguous to the United States and Canada as specified in Article IV of this Convention, and the nets, engines, gear, apparatus, and appliances which may be used therein, shall be fixed and determined by uniform and common international regulations, restrictions, and provisions; and to that end the High Contracting Parties agree to appoint, within three months after this Convention is proclaimed, a Commission to be known as the International Fisheries Commission, consisting of one person named by each Government."

By art. II it is made the duty of the commission, within six months after being named, to prepare such regulations for the protection and preservation of food fishes in the waters named in art. I, including the regulation of commercial fishing.

Art. III, so far as now important, reads:

"The two Governments engage to put into operation and to enforce by legislation and executive action, with as little delay as possible, the Regulations, restrictions, and provisions with appropriate penal-

ties for all breaches thereof; and the date when they shall be put into operation shall be fixed by the concurrent proclamations of the President of the United States and the Governor-General of the Dominion of Canada in Council."

So far as we are informed no regulations have been proclaimed as provided in art. III. Until that is done there has been no withdrawing of the state's jurisdiction to control and regulate the catching of fish in that part of Rainy Lake which lies within its own territory, that is in this case, within Koochiching county.

The contention of appellant must be rejected that by the mere adoption and proclamation of the treaty the state was divested of power to enact laws and regulations regarding fishing in the international boundary waters specified therein. This treaty does not operate of itself. It provides in art. III for both legislative and executive action before the regulation as to fishing in international waters is withdrawn from the state within whose territory the waters may be. This language from Foster v. Neilson, 2 Pet. 253, 254, 7 L. ed. 415, is applicable:

"Our Constitution declares a treaty to be the law of the land. It is consequently to be regarded in Courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision. But when the terms of the stipulation import a contract, when either of the parties engage to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the Court."

There has been no legislation as yet, nor that which puts the regulations contemplated in force by presidential proclamations. This appellant on habeas corpus raised the same question in the federal court (D. C.) 49 F. (2d) 816, and Judge Cant, in discharging the writ, ruled that as yet state jurisdiction to regulate fishing in the waters of Rainy Lake within the territorial limits of this state had not been interfered with or taken over under the Root-Bryce treaty.

Our conclusion is that the laws of this state still apply to that part of Rainy Lake this side of the boundary line fixed between this state and the province of Ontario. And, judging from the statutory enactments of Ontario, it also proceeds on the assumption that the Root-Bryce treaty has not curtailed its jurisdiction to regulate fishing in the waters upon its side of the boundary line.

The order is affirmed.