Justice Ginsburg,
concurring in the judgment.
I agree that Article 36 of the Vienna Convention grants rights that may be invoked by an individual in a judicial proceeding, and therefore join Part II of Justice Breyer’s dissenting opinion. As to the suppression and procedural default issues, I join the Court’s judgment. The dissenting opinion veers aWay from the two cases here for review, imagining other situations unlike those at hand. In neither of the cases before us would I remand for further proceedings.
*361 I turn first to the question whether a violation of Article 36 requires suppression of statements to police officers in Sanchez-Llamas’ case and others like it. Shortly after his arrest and in advance of any police interrogation, Sanchez-Llamas received the warnings required by Miranda v. Arizona, 384 U. S. 436 (1966), in both English and Spanish. Tr. 122 (Nov. 16, 2000). He indicated that he understood those warnings, id., at 123, telling the police that he had lived in the United States for approximately 11 years, id., at 124, 143, 177. After a break in questioning, Sanchez-Llamas again received Miranda warnings in Spanish, and again indicated that he understood them. Tr. 129, 176. Sanchez-Llamas, with his life experience in the United States, scarcely resembles the uncomprehending detainee imagined by Justice Breyer, post, at 393. Such a detainee would have little need to invoke the Vienna Convention, for Miranda warnings a defendant is unable to comprehend give the police no green light for interrogation. Moran v. Burbine, 475 U. S. 412, 421 (1986) (a defendant’s waiver of Miranda rights must be voluntary, knowing, and intelligent, i. e., “the product of a free and deliberate choice . . . made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it”); United States v. Garibay, 143 F. 3d 534, 537-540 (CA9 1998) (defendant, who had difficulty understanding English, did not knowingly and intelligently waive his Miranda rights where the police recited the Miranda warnings only in English); United States v. Short, 790 F. 2d 464, 469 (CA6 1986) (defendant’s limited comprehension of English cast substantial doubt on the validity of her Miranda waiver).[1]
*362 In contrast to Miranda warnings, which must be given on the spot before the police interrogate, Article 36 of the Vienna Convention does not require the arresting authority to contact the consular post instantly. See Case Concerning Avena and other Mexican Nationals (Mex. v. U S.), 2004 I. C. J. 12, ¶ 97 (Judgment of Mar. 31) (Avena) (United States’s notification of Mexican consulate within three working days of detainee’s arrest satisfied Article 36(l)(b)’s “without delay” requirement); U. S. Dept. of State, Consular Notification and Access 20, http://travel.state.gov/pdf/ CNA_book.pdf (as visited June 26, 2006, and available in Clerk of Court’s case file) (directing federal, state, and local law enforcement officials to notify the appropriate consular post “within 24 hours, and certainly within 72 hours” of a foreign national’s request that such notification be made). Nor does that article demand that questioning await notice to, and a response from, consular officials.[2] It is unsurprising, therefore, that the well researched dissenting opinion has not found even a single case in which any court, any place has in fact found suppression an appropriate remedy based on no provision of domestic law, but solely on an arresting officer’s failure to comply with Article 36 of the Vienna Convention. See post, at 395-396; ante, at 344-345, n. 3.
*363 The Court points out, and I agree, that in fitting circumstances, a defendant might successfully “raise an Article 36 claim as part of a broader challenge to the voluntariness of [a detainee’s] statements to police.” Ante, at 350. In that way, “full effect” could be given to Article 36 in a manner consistent with U. S. rules and regulations. But the question presented here is whether suppression is warranted simply because the State’s authorities failed to comply with Article 36 of the Vienna Convention. Neither the Convention itself nor the practice of our treaty partners establishes Sanchez-Llamas’ entitlement to such a remedy. See El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U. S. 155, 175-176 (1999) (construing the Warsaw Convention in accord with the views of the United States’s treaty partners).
As to the procedural default issue, I note first two anomalies. The Court explains, and I agree, that it would be extraordinary to hold that defendants, unaware of their Miranda rights because the police failed to convey the required warnings, would be subject to a State’s procedural default rules, but defendants not told of Article 36 rights would face no such hindrance. See ante, at 359. Furthermore, as the dissent apparently recognizes, in the federal-court system, a later-in-time statute, codifying a federal procedural default rule, would “supersed[e] any inconsistent provision in the Convention.” Post, at 388 (citing Breard v. Greene, 523 U. S. 371 (1998) (per curiam)). In my view, it would be unseemly, to say the least, for this Court to command state courts to relax their identical, or even less stringent procedural default rules, while federal courts operate without constraint in this regard. Post, at 388-389. That state of affairs, surely productive of friction in our federal system, should be resisted if there is a plausible choice, i. e., if a reasonable interpretation of the federal statute and international accord would avoid the conflict.
Critical for me, Bustillo has conceded that his “attorney at trial was aware of his client’s rights under the Vienna *364 Convention.” App. in No. 05-51, p. 203, n. 5. Given the knowledge of the Vienna Convention that Bustillo’s lawyer possessed, this case fails to meet the dissent’s (and the International Court of Justice’s) first condition for overriding a State’s ordinary procedural default rules: “[T]he [Vienna] Convention forbids American States to apply a procedural default rule to bar assertion of a Convention violation claim ‘where it has been the failure of the United States [or of a State] itself to inform that may have precluded counsel from being in a position to have raised the question of a violation of the Vienna Convention in the initial trial.’” Post, at 381 (quoting Avena, 2004 I. C. J., at 57, ¶ 113; emphasis deleted); accord post, at 370, 379, 382, 386. Nothing the State did or omitted to do here “precluded counsel from . .. raising] the question of a violation of the Vienna Convention in the initial trial.” Post, at 386. Had counsel done so, the trial court could have made “appropriate accommodations to ensure that the defendant secure[d], to the extent possible, the benefits of consular assistance.” Ante, at 350.[3]
In short, if there are some times when a Convention violation, standing alone, might warrant suppression, or the displacement of a State’s ordinarily applicable procedural *365 default rules, neither Sanchez-Llamas’ case nor Bustillo’s belongs in that category.
* * *
For the reasons stated, I would not disturb the judgments of the Supreme Court of Oregon and the Supreme Court of Virginia.
Justice Breyer, with whom Justice Stevens and Justice Souter join, and with whom Justice Ginsburg joins as to Part II, dissenting.
The Vienna Convention on Consular Relations (Vienna Convention or Convention) provides that when the police of a signatory nation arrest a foreign national, the detaining “authorities shall inform” the foreign national “without delay” of his “righ[t]” to communicate with his nation’s consular officers. Arts. 36(l)(a), (b), Apr. 24, 1963, [1970] 21 U. S. T. 77,100-101, T. I. A. S. No. 6820. We granted certiorari in these cases to consider three related questions: (1) May a criminal defendant raise a claim (at trial or in a postconviction proceeding) that state officials violated this provision? (2) May a State apply its usual procedural default rules to Convention claims, thereby denying the defendant the right to raise the claim in a postconviction proceeding on the ground that the defendant failed to raise the claim at trial? And (3) is suppression of a defendant’s confession (made to police after a violation of the Convention) an appropriate remedy?
The Court assumes, but does not decide, that the answer to the first question is “yes.” Ante, at 343. It answers the second question by holding that a State always may apply its ordinary procedural default rules to a defendant’s claim of a Convention violation. Ante, at 350-360. Its answer to the third question is that suppression is never an appropriate remedy for a Convention violation. Ante, at 343-350.
*366 Unlike the majority, I would decide the first question and answer it affirmatively. A criminal defendant may, at trial or in a postconviction proceeding, raise the claim that state authorities violated the Convention in his case. My answer to the second question is that sometimes state procedural default rules must yield to the Convention’s insistence that domestic laws “enable full effect to be given to the purposes for which” Article 36’s “rights ... are intended.” Art. 36(2), 21 U. S. T., at 101. And my answer to the third question is that suppression may sometimes provide an appropriate remedy. After answering these questions, I would remand these cases, thereby permitting the States to apply their own procedural and remedial laws, but with the understanding that the Federal Constitution requires that the application of those laws be consistent with the Convention’s demand for an effective remedy for an Article 36 violation. See U. S. Const., Art. VI, cl. 2 (“[A]ll Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby”).
I
A
The Vienna Convention is an international treaty that governs relations between individual nations and foreign consular officials. The United States and 169 other nations have ratified the Convention. Its adoption in 1963 was perhaps “the single most important event in the entire history of the consular institution.” L. Lee, Consular Law and Practice 26 (2d ed. 1991). The Convention defines consular functions to include “protecting in the receiving State the interests of the sending State and of its nationals,” and “helping and assisting nationals ... of the sending State.” Arts. 5(a), (e), 21 U. S. T., at 82-83. The United States ratified the Convention in 1969.
*367 Article 36 of the Convention governs relations between a consulate and its nationals, particularly those who have been arrested by the host country. Its object is to assure consular communication and assistance to such nationals, who may not fully understand the host country’s legal regime or even speak its language. Article 36 reads as follows:
“1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
“(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;
“(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;
“2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.” 21 U. S. T., at 100-101 (emphasis added).
The U. S. State Department’s Foreign Affairs Manual has long stressed the importance the United States places upon these provisions. It says, “[0]ne of the basic functions of a *368 consular officer has been to provide a ‘cultural bridge’ between the host community and the [U. S. national]. No one needs that cultural bridge more than the individual U. S. citizen who has been arrested in a foreign country or imprisoned in a foreign jail.” 7 Foreign Affairs Manual § 401 (1984); see also id., §§401-426 (2004).
B
In 1969, the United States also ratified (but the President has since withdrawn from) an Optional Protocol to the Convention. See Optional Protocol Concerning the Compulsory Settlement of Disputes (Optional Protocol), Apr. 24, 1963, [1970] 21 U. S. T. 325, T. I. A. S. No. 6820; Letter from Condoleezza Rice, Secretary of State, to Kofi A. Annan, Secretary-General of the United Nations (Mar. 7,, 2005) (giving notice of United States’ withdrawal from the Optional Protocol). The Optional Protocol provides that “[disputes arising out of the interpretation or application of the Convention shall lie within the compulsory jurisdiction of the International Court of Justice [ICJ].” Art. I, 21 U. S. T., at 326.
Acting pursuant to the Optional Protocol, Germany (in 1999) and Mexico (in 2003) brought proceedings before the ICJ, seeking redress for what they said were violations of Article 36 by the United States. LaGrand Case (F. R. G. v. U. S.), 2001 I. C. J. 466 (Judgment of June 27) (LaGrand); Case Concerning Avena and other Mexican Nationals (Mex. v. U S.), 20041. C. J. 12 (Judgment of Mar. 31) (Avena).
In Germany’s case, the ICJ rejected the United States’ claim that the “rights of consular notification and access under [Article 36] are rights of States, and not of individuals.” LaGrand, 2001 I. C. J., at 493, ¶ 76, It held instead that (1) if an arrested foreign national is prejudiced by the host country’s failure to inform him of his Article 36 rights, and (2) if that individual has “been subjected to prolonged detention or convicted and sentenced to severe penalties,” then a diplomatic apology alone is not a sufficient remedy. *369 Id., at 513-514, ¶ 125. Rather, the Convention requires the host country, in that case the United States, “to allow the review and reconsideration of the” foreign national’s “conviction and sentence by taking account of the violation of the rights set forth in the Convention.” Id., at 514, ¶ 125. The ICJ added that “[t]he choice of means” for providing this review “must be left to the United States.” Ibid. In addition, the ICJ stated that in the case before it, application of a procedural default rule (that is, the rule that the LaGrands could not bring their Convention claims in habeas proceedings because they had not raised those claims at trial) violated Article 36(2) of the Convention because it “had the effect of preventing ‘full effect [from being] given to the purposes for which the rights accorded under this article are intended.’” Id., at 498, ¶ 91 (quoting Art. 36(2), 21 U. S. T., at 101). In the ICJ’s view, it was “the failure of the American authorities to comply” with Article 36 that prevented the LaGrands from raising their claims earlier. LaGrand, supra, at 497, ¶ 91.
In Mexico’s case, the ICJ reiterated its view that Article 36, in addition to imposing obligations on member nations, also allows foreign nationals to bring claims based on those violations in domestic judicial proceedings. The ICJ noted that, as a matter of international law, breach of a treaty ordinarily “ ‘involves an obligation to make reparation in an adequate form.’ ” Avena, supra, at 59, ¶ 119 (quoting Factory at Chorzów, Jurisdiction, 1927, R C. I. J., ser. A, No. 9, p. 21). Applying that principle to the Convention, the ICJ concluded that “the remedy to make good . .. violations [of Article 36] should consist in an obligation on the United States to permit review and reconsideration of these nationals’ cases by the United States courts ... with a view to ascertaining whether in each ease the violation .. . caused actual prejudice to the defendant in the process of administration of criminal justice.” Avena, 2004 I. C. J., at 60, ¶ 121 (emphasis added). The court added that this “ ‘review and reconsideration,’ ” to *370 be “effective,” must “fully examinfe] and tak[e] into account” any such prejudice to the defendant. Id., at 65, ¶ 138. The ICJ declined to specify the means by which American courts should provide such “review and reconsideration.” Instead, the ICJ said, the appropriate remedy depends upon an examination of “the concrete circumstances of each case” and should be determined “by the United States courts concerned in the process of their review and reconsideration.” Id., at 61, ¶ 127.
In respect to procedural default, the ICJ referenced what it said in LaGrand, while adding the critically important qualification that the cases in which the Convention blocked application of a procedural default rule were those in which it was “the failure of the United States itself to inform” an arrested foreign national of his right to contact the consulate that “precluded counsel from being in a position to have raised the question of a violation of the Vienna Convention in the initial trial.” Avena, supra, at 57, ¶ 113.
C
For present purposes, the key sections of the Convention are (1) the provision that requires the United States to “inform” an arrested person “without delay” of his Article 36 rights, including the right to “communicat[e]” with his “consular post,” and (2) the provision that says domestic laws and regulations “must enable full effect to be given” to the purposes underlying those requirements.
The key ICJ holdings are its determinations (1) that the Convention obligates a member nation to inform an arrested foreign national without delay that he may contact his consulate; (2) that the Convention requires the United States to provide some process for its courts to “review and recon-side[r]” criminal convictions where there has been a prejudicial violation of this obligation; and (3) that this “review and reconsideration” cannot be foreclosed on the ground that the foreign national did not raise the violation at trial where the *371 authorities’ failure to inform the foreign national of his rights prevented him from timely raising his claim.
II
The first question presented is whether a criminal defendant may raise a claim (at trial or in a postconviction proceeding) that state officials violated Article 36 of the Convention. The Court assumes that the answer to this question is “yes,” but it does not decide the matter because it concludes in any event that the petitioners are not entitled to the remedies they seek. As explained below, I would resolve those remedial questions differently. Hence, I must decide, rather than assume, the answer to the first question presented.
Regardless, the first question raises an important issue of federal law that has arisen hundreds of times in the lower federal and state courts. See generally Wooster, Construction and Application of Vienna Convention on Consular Relations (VCCR), Requiring That Foreign Consulate Be Notified When One of Its Nationals Is Arrested, 175 A. L. R. Fed. 243 (2002) (collecting federal cases). Those courts have divided as to the proper answer. Compare Cardenas v. Dretke, 405 F. 3d 244 (CA5 2005) (defendant cannot bring Convention claim in judicial proceeding); United States v. Emueghunam, 268 F. 3d 377 (CA6 2001) (same); State v. Martinez-Rodriguez, 2001-NMSC-029, 33 P. 3d 267 (same); 338 Ore. 267, 108 P. 3d 573 (2005) (same); Shackleford v. Commonwealth, 262 Va. 196, 547 S. E. 2d 899 (2001) (same), with Jogi v. Voges, 425 F. 3d 367 (CA7 2005) (defendant can bring Convention claim in judicial proceeding). And the issue often arises in a legal context where statutes or procedural requirements arguably block this Court’s speedy review. See Medellín v. Dretke, 544 U. S. 660 (2005) (per curiam). We granted the petitions for certiorari in significant part in order to decide this question. And, given its importance, we should do so.
*372 In answering the question, it is common ground that the Convention is “self-executi[ng].” See S. Exec. Rep. No. 91-9, p. 5 (1969); see also Brief for Respondent in No. 04-10566, pp. 9-10; Brief for Respondent in No. 05-51, p. 23. That is to say, the Convention “operates of itself without the aid of any legislative provision.” Foster v. Neilson, 2 Pet. 253, 314 (1829). The parties also agree that we need not decide whether the Convention creates a “private right of action,” i. e., a private right that would allow an individual to bring a lawsuit for enforcement of the Convention or for damages based on its violation. Rather, the question here is whether the Convention provides, in these cases, law applicable in legal proceedings that might have been brought irrespective of the Vienna Convention claim, here an ordinary criminal appeal and an ordinary postconviction proceeding.
Bustillo, for example, has brought an action under a Virginia statute that allows any convicted person to seek release from custody on the ground that “he is detained without lawful authority.” Va. Code Ann. § 8.01-654(A)(1) (Lexis Supp. 2006). Sanchez-Llamas has challenged his state criminal conviction on direct appeal, and in that proceeding he is entitled to claim that his conviction violates state or federal law. In both cases, the petitioners argue that a court decision favoring the prosecution would violate the Convention (as properly interpreted), and therefore the Constitution forbids any such decision. See U. S. Const., Art. VI, cl. 2. This argument in effect claims that the Convention itself provides applicable law that here would favor the petitioners if, but only if, they are correct as to their interpretation of the Convention (which is, of course, a different matter).
The petitioners must be right in respect to their claim that the Convention provides law that here courts could apply in their respective proceedings. The Convention is a treaty. And “all Treaties made ... under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby.” Ibid. As *373 Chief Justice Marshall long ago explained, under the Supremacy Clause a treaty is “to be regarded in Courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision.” Foster, supra, at 314.
Directly to the point, this Court stated long ago that a treaty “is a law of the land as an act of Congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice,” in such a case the court is to “resor[t] to the treaty for a rule of decision for the case before it as it would to a statute.” Head Money Cases, 112 U. S. 580, 598-599 (1884).
As noted above, see supra, at 372, the parties agree that the Convention “operates of itself without the aid of any legislative provision.” Foster, supra, at 314. The question, then, is the one this Court set forth in the Head Money Cases: Does the Convention set forth a “law” with the legal stature of an Act of Congress? And as the Court explained, we are to answer that question by asking, does the Convention “prescribe a rule by which the rights of the private citizen . . . may be determined”? Are the obligations set forth in Article 36(l)(b) “of a nature to be enforced in a court of justice”?
The “nature” of the Convention provisions raised by the petitioners indicates that they are intended to set forth standards that are judicially enforceable. Those provisions consist of the rights of a foreign national “arrested” or “detained in any other manner” (1) to have, on his “re-ques[t],” the “consular post” “inform[ed]” of that arrest or detention; (2) to have forwarded “without delay” any “communication addressed to the consular post”; and (3) to be “inform[ed] . . . without delay” of those two “rights.” Art. 36(l)(b), 21 U. S. T., at 101. These rights do not differ in their “nature” from other procedural rights that courts commonly enforce. Cf. U. S. Const., Arndt. 6 (“In all criminal *374 prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation”); ibid. (“In all criminal prosecutions, the accused shall enjoy the right... to have the Assistance of Counsel for his defence”); Miranda v. Arizona, 384 U. S. 436 (1966).
Moreover, the language of Article 36 speaks directly of the “rights” of the individual foreign national. See Art. 36(1)(b), 21 U. S. T., at 101 (“The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph” (emphasis added)). Article 36 thus stands in stark contrast to other provisions of the Convention, which speak in terms of the rights of the member nations or consular officials. Cf. Art. 9, id., at 86 (discussing “the right of any of the Contracting Parties to fix the designation of consular officers” (emphasis added)); Art. 34, id., at 98 (consular officials shall have “freedom of movement and travel”); Art. 35(1), id., at 99 (consular officials shall have “freedom of communication”); Art. 41(1), id., at 103 (“Consular officers shall not be liable to arrest or detention pending trial”).
Suppose that a pre-Miranda federal statute had said that arresting authorities “shall inform a detained person without delay of his right to counsel.” Would courts not have automatically assumed that this statute created applicable law that a criminal defendant could invoke at trial? What more would the statute have to say? See Medellín, 544 U. S., at 687 (O’Connor, J., dissenting) (“And if a statute were to provide, for example, that arresting authorities ‘shall inform a detained person without delay of his right to counsel,’” what “more would be required” to permit “a defendant” to “invoke that statute”?).
Further, this Court has routinely permitted individuals to enforce treaty provisions similar to Article 36 in domestic judicial proceedings. In United States v. Rauscher, 119 U. S. 407, 410-411 (1886), for example, this Court concluded that the defendant could raise as a defense in his federal criminal trial the violation of an extradition treaty that said: *375 “ ‘It is agreed that the United States and Her Britannic Majesty shall, upon mutual requisitions by them . . . deliver up to justice all persons’” charged with certain crimes in the other country. Similarly, in Kolovrat v. Oregon, 366 U. S. 187, 191, n. 6 (1961), the Court held that foreign nationals could challenge a state law limiting their right to recover an inheritance based on a treaty providing that “‘[i]n all that concerns the right of acquiring, possessing or disposing of every kind of property . . . citizens of [each country who reside in the other] shall enjoy the rights which the respective laws grant... in each of these states to the subjects of the most favored nation.’” And in Asakura v. Seattle, 265 U. S. 332, 340 (1924), the Court allowed a foreign national to challenge a city ordinance forbidding noncitizens from working as pawnbrokers under a treaty stating that “ ‘citizens or subjects of each of the High Contracting Parties shall have liberty ... to carry on trade’ ” and “ ‘generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects.’ ”
In all these cases, the Court recognized that (1) a treaty obligated the United States to treat foreign nationals in a certain manner; (2) the obligation had been breached by the Government’s conduct; and (3) the foreign national could therefore seek redress for that breach in a judicial proceeding, even though the treaty did not specifically mention judicial enforcement of its guarantees or even expressly state that its provisions were intended to confer rights on the foreign national. Language and context argue yet more strongly here in favor of permitting a criminal defendant in an appropriate case to find in the Convention a law to apply in the proceeding against him.
In addition, the Government concedes that individual consular officials may enforce other provisions of the Convention in American courts. For example, Article 43(1) grants consular officials immunity from “the jurisdiction of the” host country’s “judicial or administrative authorities” for *376 “acts performed in the exercise of consular functions.” 21 U. S. T., at 104. The federal courts have held that a consular official may raise Article 48(1) in a judicial proceeding, even though that provision does not expressly mention a judicial remedy. See, e. g., Risk v. Halvorsen, 936 F. 2d 393, 397 (CA9 1991); Gerritsen v. de la Madrid Hurtado, 819 F. 2d 1511, 1515-1516 (CA9 1987); see also Brief for United States as Amicus Curiae 14, n. 2 (citing with approval these cases). What in Article 36 warrants treating it differently in this respect?
Finally, the international tribunal that the United States agreed would resolve disputes about the interpretation of the Convention, the ICJ, has twice ruled that an arrested foreign national may raise a violation of the arresting authorities’ obligation to “inform [him] without delay of his rights under” Article 36(1) in an American judicial proceeding. See Avena, 2004 I. C. J. 12; LaGrand, 2001 1. C. J. 466. That conclusion, as an “interpretation of an international agreement by an international court” deserves our “'respectful consideration.’” Ante, at 355 (opinion of the Court). That “respectful consideration,” for reasons I shall explain, see infra, at 382-385, counsels in favor of an interpretation that is consistent with the ICJ’s reading of the Convention here.
The Government says to the contrary that Article 36 is “addressed solely to the rights of States and not private individuals”; hence, a foreign national may not claim in an American court that a State has convicted him without the consular notification that Article 36 requires. Brief for United States as Amicus Curiae 7. But its arguments are not persuasive. The Government rests this conclusion primarily upon its claim that there is a “long-established presumption that treaties and other international agreements do not create judicially enforceable individual rights.” Id., at 11.
The problem with that argument is that no such presumption exists. The Government cites three cases in support of *377 its position, Charlton v. Kelly, 229 U. S. 447, 474 (1913); Whitney v. Robertson, 124 U. S. 190, 195 (1888); and Foster, 2 Pet., at 306-307. The first of these, Charlton, says that the question whether a treaty has been abrogated by another nation’s violations is a matter with which “‘judicial tribunals have nothing to do.’” 229 U. S., at 474. The second, Whitney, says that whether a subsequent federal statute that abrogates a treaty violates the United States’ treaty obligations is a matter that has “not been confided to the judiciary.” 124 U. S., at 195. The third, Foster, says that in “a controversy between two nations concerning national boundary, it is scarcely possible that the Courts of either should refuse to abide by the measures adopted by its own government.” 2 Pet., at 306-307. What have these issues to do with the present one? How do these cases support the presumption that the Government claims?
Regardless, as I have just said, see supra, at 373, the Head Money Cases make clear that a treaty may confer certain enforceable “rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other.” 112 U. S., at 598; see also 2 Restatement (Third) on Foreign Relations Law of the United States § 907 (1986) (hereinafter Restatement) (“A private person having rights against the United States under an international agreement may assert those rights in courts in the United States”). And the language of the Convention makes clear that it is such a treaty. Indeed, to my knowledge no other nation’s courts (or perhaps no more than one) have held to the contrary. The cases cited by the respondents and the Government do not say otherwise. See Judgment of Nov. 7, 2001, 5 BGHSt 116 (Germany) (deciding in light of LaGrand that the Convention creates individual rights, but declining to suppress confession); Queen v. Abbrederis (1981) 51 F. L. R. 99, 115 (Ct. Crim. App. New South Wales (Australia)) (deciding that Convention does not “affect the carrying out of an investigation by interrogation of a foreign person coming to this country”). *378 But see Queen v. Van Bergen, [2000] 261 A. R. 387, 390 (Ct. App. Alberta (Canada)) (noting in dictum that the Convention “creates an obligation between states and is not one owed to the national,” but affirming denial of suppression motion on the ground that “there was in any event no proven prejudice to” the defendant). See also Queen v. Partak, [2001] 160 C. C. C. 3d 553 (Ont. Super. Ct. of J.) (applying Van Bergen’s “serious prejudice” test to conclude that the defendant’s statements were admissible); compare cases cited infra, at 394-395.
The Government also points out that the Executive Branch’s interpretation of treaty provisions is entitled to “great weight.” Sumitomo Shoji America, Inc. v. Avagliano, 457 U. S. 176, 184, 185 (1982). I agree with this presumption. But the Executive’s views on our treaty obligations are “not conclusive.” Id., at 184; see Perkins v. Elg, 307 U. S. 325, 328, 337-342 (1939) (declining to adopt Executive’s treaty interpretation); Johnson v. Browne, 205 U. S. 309, 319-321 (1907) (same); De Lima v. Bidwell, 182 U. S. 1, 181, 194-199 (1901) (same). Where language, the nature of the right, and the ICJ’s interpretation of the treaty taken separately or together so strongly point to an intent to confer enforceable rights upon an individual, I cannot find in the simple fact of the Executive Branch’s contrary view sufficient reason to adopt the Government’s interpretation of the Convention.
Accordingly, I would allow the petitioners to raise their claims based on violations of the Convention in their respective state-court proceedings.
Ill
The more difficult issue, I believe, concerns the nature of the Convention’s requirements as to remedy. In particular, Bustillo’s case concerns a state procedural default rule. When, if ever, does the Convention require a state court to set aside such a rule in order to hear a criminal defendant’s *379 claim that the police did not “inform” him of his “right” to communicate with his “consular post”? Art. 36(l)(b), 21 U. S. T., at 101. The Court says that the answer is “never.” See ante, at 350-360. In its view, the Convention does not under any circumstances trump a State’s ordinary procedural rules requiring a defendant to assert his claims at trial or lose them forever.
In my view, Article 36 of the Convention requires a less absolute answer. Article 36 says that the rights it sets forth “shall be exercised in conformity with the laws and regulations of the receiving State,” but it instantly adds, “subject to the proviso . . . that the said laws and regulations must enable full effect to be given to the purposes for which the [Article 36] rights are ... intended.” Art. 36(2), 21 U. S. T., at 101 (emphasis added). The proviso means that a State’s ordinary procedural default rules apply unless (1) the defendant’s failure to raise a Convention matter (e. g., that police failed to inform him of his Article 36 rights) can itself be traced to the failure of the police (or other governmental authorities) to inform the defendant of those Convention rights, and (2) state law does not provide any other effective way for the defendant to raise that issue (say, through a claim of ineffective assistance of counsel).
Several considerations lead to this conclusion. First, as I have just noted, Article 36 says both that its rights “shall be exercised in conformity with” the host country’s “laws and regulations” and that those “laws and regulations must enable full effect to be given” to the purposes for which those rights “are intended.” This interpretation makes both the “conformity” requirement and the “full effect” requirement meaningful.
Second, the Convention’s drafting history supports this interpretation. The first draft of the Vienna Convention was written by the International Law Commission. Article 36(2) of that draft required only that domestic laws “not nullify” the rights afforded by the Convention. Draft Articles *380 on Consular Relations Adopted by the International Law Commission at its Thirteenth Session, Art. 36(2), reprinted in L. Lee, Vienna Convention on Consular Relations 237 (1966). A later amendment substituted the “full effect” phrase over the strenuous objection of several negotiating countries whose delegates argued that the phrase would “modify the criminal laws and regulations or the criminal procedure of the receiving State.” 1 United Nations Conference on Consular Relations, Official Records, Summary records of plenary meetings and of the meetings of the First and Second Committees, U. N. Doc. A/CONF.25/16, ¶26, p. 38 (1963) (statement of Romania). See also id., ¶ 30, at 38-39 (statement of Congo, Leopoldville) (amendment “implied the revision of certain laws or regulations, which it would be difficult to carry out in practice”); id., 12th mtg., ¶ 4, at 40 (statement of Union of Soviet Socialist Republics) (rejecting the amendment because it would “force [signatories] to alter their criminal laws and regulations”); id., 20th mtg., ¶ 81, at 84 (statement of Romania) (same); id., ¶ 95, at 86 (statement of Czechoslovakia) (same).
Based on this objection, the Soviet Union proposed reverting to the original language. The United Kingdom opposed that measure, explaining that it supported the “full effect” version because the initial (“not nullify”) version
“meant that the laws and regulations of the receiving State would govern the rights specified . . . provided that they did not render those rights completely inoperative—for ‘to nullify’ meant to ‘render completely inoperative’. But rights could be seriously impaired without becoming completely inoperative. . . . Consular officials should, of course, comply with the laws and regulations of the receiving State in such matters as the times for visiting prisoners, but it was most important that the substance of the rights and obligations specified . . . should be preserved.” Id., ¶¶ 6-7, at 40.
*381 No one disagreed with the United Kingdom’s understanding of the words “full effect.” And with that understanding, the delegates voted down the Soviet Union’s proposal to revert to the original language, and ultimately adopted the provision with the words “full effect.” Id., ¶ 109, at 87. As so enaeted, the provision reflects the “essential principle of international law .. . ‘that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed.’ ” 2 Restatement § 901, at 343.
Third, the decisions of the ICJ, fairly read, interpret the Convention similarly. In LaGrand and Avena, the ICJ read the Convention as authorizing an individual foreign national to raise an Article 36 violation at trial or in a postconviction proceeding. See Avena, 2004 I. C. J., at 59-60, ¶ 121; LaGrand, 2001 I. C. J., at 513-514, ¶ 125. The ICJ added that the Convention requires member states to provide “effective” remedies in their courts for Convention violations. See Avena, supra, at 65, ¶ 138. And the ICJ made two critical statements in respect to procedural default rules. In La-Grand, the court said that in “itself, the [procedural default] rule does not violate Article 36 of the Vienna Convention.” 20011. C. J., at 497, ¶ 90 (emphasis added). Rather, the “problem arises when the procedural default rule does not allow the detained individual to challenge a conviction and sentence by claiming ... that the competent national authorities failed to comply with their obligation to provide the requisite consular information ‘without delay.’ ” Ibid. And the ICJ later specified that the Convention forbids American States to apply a procedural default rule to bar assertion of a Convention violation claim “where it has been the failure of the United States [or of a State] itself to inform that may have precluded counsel from being in a position to have raised the question of a violation of the Vienna Convention in the initial trial.” Avena, 20041. C. J., at 57, ¶ 113 (emphasis added).
*382 This last statement indicates that the ICJ understood the Convention to prevent application of a procedural default rule only where the arresting authorities’ failure to inform the foreign national of his Convention rights brought about the procedural default in the first place. Taken together, the above statements make clear that the ICJ read the Convention simply to require an effective remedy. It stated repeatedly that it did not dictate what that remedy would be, as long as it was offered as part of the “judicial process.” Id., at 65-66, ¶¶ 140-141. Hence, if the State provides some other effective remedy, for example, review for prejudice through a claim of ineffective assistance of counsel, then the Convention would not forbid application of ordinary procedural default rules. See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.6 (rev. ed. Feb. 2003) (discussing defense counsel’s obligation to seek consular assistance); Valdez v. State, 46 P. 3d 703, 710 (Okla. Crim. App. 2002) (granting postconviction relief to a defendant who had failed to raise a Vienna Convention violation at trial, because he showed that his lawyer “could have obtained financial, legal and investigative assistance from his consulate” that would have produced important new evidence); see also Ledezma v. State, 626 N. W. 2d 134, 152 (Iowa 2001) (concluding that “all criminal defense attorneys representing foreign nationals should be aware of the right to consular access as provided by Article 36, and should advise their clients of this right” because local counsel “are not equipped to provide the same services as the local consulate”); cf. Rompilla v. Beard, 545 U. S. 374 (2005).
I will assume that the ICJ’s interpretation does not bind this Court in this case. Statute of the International Court of Justice, Art. 59, 59 Stat. 1062, T. S. No. 993 (1945) (ICJ decisions have “binding force” only “between the parties and in respect of that particular case”). But as the majority points out, the ICJ’s decisions on this issue nonetheless warrant our “'respectful consideration.’” Ante, at 355. That *383 “respectful consideration” reflects the understanding that uniformity is an important goal of treaty interpretation. See Olympic Airways v. Husain, 540 U. S. 644, 660 (2004) (Scalia, J., dissenting) (“[I]t is reasonable to impute to the parties an intent that their respective courts strive to interpret the treaty consistently”). And the ICJ’s position as an international court specifically charged with the duty to interpret numerous international treaties (including the Convention) provides a natural point of reference for national courts seeking that uniformity. See Counter-Memorial of the United States in Avena, 2004 I. C. J. No. 128, p. 61, n. 128 (Nov. 3, 2003) (even if ICJ decision binds only in particular case, “it is well-settled” that an ICJ decision “may serve as authority beyond a particular case”; citing authorities); Ordonez & Reilly, Effect of the Jurisprudence of the International Court of Justice on National Courts, in International Law Decisions in National Courts 335, 365 (T. Franck & G. Fox eds. 1996) (noting that ICJ cases interpreting treaties “are routinely cited by domestic judges” in many countries “as evidence of international law”).
That “respectful consideration” also reflects an understanding of the ICJ’s expertise in matters of treaty interpretation, a branch of international law. The ICJ’s opinions “are persuasive evidence” of what “[international] law is.” 1 Restatement § 103, at 37, Comment b; see also Morrison, Treaties as a Source of Jurisdiction, Especially in U. S'. Practice, in The International Court of Justice at a Crossroads 58,61 (L. Damrosch ed. 1987); The Paquete Habana, 175 U. S. 677, 700 (1900) (“[Trustworthy evidence of what [international] law really is” can be found in “the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat”); L. Henkin, R. Pugh, O. Schaehter, & H. Smit, International Law: Cases and Materials 120 (3d ed. 1993) (“[T]he decisions of the [ICJ] are, on *384 the whole, regarded by international lawyers as highly persuasive authority of existing international law”).
Thus, this Court has repeatedly looked to the IC J for guidance in interpreting treaties and in other matters of international law. See, e. g., United States v. Maine, 475 U. S. 89, 99-100 (1986) (referring to the Fisheries Case (United Kingdom v. Norway), 1951 I. C. J. 116 (Judgment of Dec. 18), as legal authority in a maritime boundary dispute); United States v. Louisiana, 470 U. S. 93, 107 (1985) (same); United States v. Louisiana, 394 U. S. 11, 69-72 (1969) (same); First Nat. City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U. S. 611, 628-629, and n. 20 (1983) (citing Case Concerning The Barcelona Traction, Light & Power Co., 1970 I. C. J. 3 (Judgment of Feb. 5), for the proposition that an incorporated entity “is not to be regarded as legally separate from its owners in all circumstances”); United States v. California, 381 U. S. 139, 172 (1965) (citing the Corfu Channel Case, 1949 I. C. J. Rep. 4 (Judgment of Apr. 9), in boundary dispute); Reid v. Covert, 35.4 U. S. 1, 61 (1957) (Frankfurter, J., concurring in result) (citing France v. United States, 1952 I. C. J. Rep. 176 (Judgment of Aug. 27), as authority for the meaning of the word “ ‘disputes’ ” in international treaties).
The lower courts have done the same. See, e. g., McKesson Corp. v. Islamic Republic of Iran, 52 F. 3d 346, 352 (CADC 1995); Princz v. Federal Republic of Germany, 26 F. 3d 1166, 1180, 1184 (CADC 1994) (Wald, J., dissenting); Siderman de Blake v. Republic of Argentina, 965 F. 2d 699, 715 (CA9 1992); Committee of United States Citizens Living in Nicaragua v. Reagan, 859 F. 2d 929, 932, 935 (CADC 1988); Arcoren v. Peters, 811 F. 2d 392, 397, n. 11 (CA8 1987); Conservation Law Foundation of New England v. Secretary of Interior, 790 F. 2d 965, 967 (CAI 1986); Persinger v. Islamic Republic of Iran, 729 F. 2d 835, 837, 843 (CADC 1984); McKeel v. Islamic Republic of Iran, 722 F. 2d 582, 585 (CA9 1983); Cruz v. Zapata Ocean Resources, Inc., 695 F. 2d *385 428, 433, and nn. 8-9 (CA9 1982); Spiess v. C. Itoh & Co. (America), Inc., 643 F. 2d 353, 365 (CA5 1981) (Reavley, J., dissenting); Agee v. Muskie, 629 F. 2d 80, 90 (CADC 1980) (MacKinnon, J., dissenting); Sadat v. Mertes, 615 F. 2d 1176, 1187-1188, n. 14 (CA7 1980) (per curiam); Narenji v. Civiletti, 617 F. 2d 745, 748 (CADC 1979); United States v. Postal, 589 F. 2d 862, 869 (CA5 1979); McComish v. Commissioner, 580 F. 2d 1323, 1329 (CA9 1978); Diggs v. Richardson, 555 F. 2d 848, 849 (CADC 1976); Island Airlines, Inc. v. CAB, 352 F. 2d 735, 741 (CA9 1965); Rogers v. Societe Internationale Pour Participations Industrielles et Commerciales, S. A., 278 F. 2d 268, 273, n. 3 (CADC 1960) (Fahy, J., dissenting); Greenpeace, Inc. v. France, 946 F. Supp. 773, 783 (CD Cal. 1996); Looper v. Morgan, Civ. A. No. H-92-0294, 1995 WL 499816, *1 (SD Tex., June 23, 1995); Koru North America v. United States, 701 F. Supp. 229, 232 (CIT 1988); United States v. Central Corp. of Ill., No. 87 C 5072, 1987 WL 20129 (ND Ill., Nov. 13, 1987); United States v. Palestine Liberation Organization, 695 F. Supp. 1456, 1461-1462, 1467 (SDNY 1988); Morgan Guaranty Trust Company of N. Y. v. Republic of Palau, 639 F. Supp. 706, 715 (SDNY 1986); Massachusetts v. Clark, 594 F. Supp. 1373, 1387-1388, n. 8 (Mass. 1984); United States-South West Africa/Namibia Trade & Cultural Council v. Department of State, 90 F. R. D. 695, 696, n. 2 (DC 1981); Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 505 F. Supp. 1125, 1187 (ED Pa. 1980); Rodriguez Fernandez v. Wilkinson, 505 F. Supp. 787, 797 (Kan. 1980); In re Alien Children Ed. Litigation, 501 F. Supp. 544, 591 (SD Tex. 1980); American Int’l Group, Inc. v. Islamic Republic of Iran, 493 F. Supp. 522, 525 (DC 1980); National Airmotive v. Government and State of Iran, 491 F. Supp. 555, 556 (DC 1980); CAB v. Island Airlines, Inc., 235 F. Supp. 990, 1003-1004, and nn. 23-24, 1005, and n. 27 (Haw. 1964); United States v. Melekh, 190 F. Supp. 67, 81, 89 (SDNY I960); Balfour, Guthrie & Co. v. United States, 90 F. Supp. 831, 834, n. 1 (ND Cal. 1950).
*386 Today’s decision interprets an international treaty in a manner that conflicts not only with the treaty’s language and history, but also with the ICJ’s interpretation of the same treaty provision. In creating this last mentioned conflict, as far as I can tell, the Court’s decision is unprecedented.
The Court supports its interpretation in three basic ways. First, the majority says that “respectful consideration” does not require us to agree with a decision that is clearly wrong. And, it says, the ICJ’s decision is clearly wrong. The ICJ’s interpretation of Article 36, the majority says, would permit a Convention violation claim to “trump not only procedural default rules, but any number of other rules requiring parties to present their legal claims at the appropriate time for adjudication.” Ante, at 357. That interpretation, it adds, “overlooks the importance of procedural default rules in an adversary system,” and is “inconsistent with the basic framework” of that “system.” Ante, at 356-357.
The majority’s argument, however, overlooks what the ICJ actually said, overstates what it actually meant, and is inconsistent with what it actually did. In Avena and LaGrand, the ICJ did not say that the Convention necessarily trumps any, let alone all, procedural rules that would otherwise bar assertion of a Convention violation claim. Nor did it say that the Convention necessarily trumps all procedural default rules. Rather, it said that the Convention prohibits application of those rules to a Convention violation claim only “where it has been the failure of the United States [or of a State] itself to inform that may have precluded counsel from being in a position to have raised the question of a violation of the Vienna Convention in the initial trial.” Avena, 2004 I. C. J., at 57, ¶ 113 (emphasis added). Thus, Article 36(2) precludes procedural default only where the defendant’s failure to bring his claim sooner is the result of the underlying violation. Since procedural default rules themselves typically excuse defaults where a defendant shows “cause and prejudice,” it is difficult to see how this statement “overlooks *387 the importance of procedural default rules in an adversary system,” or is “inconsistent with the basic framework” of that “system.”
Moreover, Avena and LaGrand make clear what the ICJ’s language taken in context means: The Convention requires effective national remedies; hence local procedural rules must give way (to the Convention’s “full effect” requirement) when, but only when, it is the failure of the arresting authorities to inform the defendant of his Convention rights that prevented the defendant from bringing his claim sooner. The opinions nowhere suggest that a State must provide a procedural remedy to a defendant who, for example, sleeps on his rights.
Consider, too, what the IC J did in Avena, a case that clarified the court’s earlier LaGrand opinion. It did not hold that American courts must ignore their procedural default rules in each of the 54 individual cases at issue. Rather, it held that domestic courts must provide “review and reconsideration” in each case. Avena, 2004 I. C. J., at 72, ¶ 153(9). It nowhere forbids a state court conducting such a “review” to bar claims not timely made provided that the violation did not itself cause the delay. See id., at 65, ¶ 139.
Perhaps the ICJ’s opinions are open to different interpretations. But how does reading those opinions as creating an extreme rule of law, as reflecting a lack of understanding of the “adversary system,” show “respectful consideration”? To show that kind of respect, we must read the opinions in light of the Convention’s underlying language and purposes and ask whether, or to what extent, they require modification of a State’s ordinary procedural rules. See Art. 36(2), 21 U. S. T., at 101 (laws and regulations “must enable full effect to be given to the purposes for which the rights accorded under this Article are intended” (emphasis added)).
Nothing in Avena suggests, for example, that an arrested foreign national who was already aware of his rights under Article 36, or who had a lawyer who was aware of those *388 rights, necessarily would be entitled to an exemption from the State’s procedural default rules under Article 36(2). Instead, as I have explained, see supra, at 381-382, 387, Avena says only that Article 36(2) requires a state court to excuse a procedural default rule where the State failed to inform the defendant of his consular access rights, and the defendant was not aware of those rights, and the State is unwilling to provide some other effective remedy, for example (if the lawyer acts incompetently in respect to Convention rights of which the lawyer was aware) an ineffective-assistance-of-counsel claim. The Court’s reluctance to give LaGrand and Avena this perfectly reasonable interpretation reflects a failure to provide in practice the “respectful consideration” that we all believe the law demands.
The Court also relies on Breard v. Greene, 523 U. S. 371 (1998) (per curiam). In that case, a foreign national, claiming a Convention violation, sought federal habeas corpus. This Court upheld a denial of relief on the ground that the lower courts had correctly found that Breard procedurally defaulted his Convention violation claim by failing to timely raise it in his state-court proceedings. In reaching its conclusion, the Court rejected Breard’s claim that the Convention trumped the procedural default rule. Its reasons were (1) that “it has been recognized in international law that, absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of the treaty in that State,” id., at 375; (2) that this principle is “embodied in the Vienna Convention itself, which provides that the rights expressed in the Convention ‘shall be exercised in conformity with the laws and regulations of the receiving State,’” ibid.; and (3) that the federal procedural default rule, as a later-in-time federal statute, superseded any inconsistent provision in the Convention, id., at 376.
I do not believe that Breard controls the outcome of these cases. With respect to the third ground for the Court’s deci *389 sion, Breará concerned a federal, rather than (as in Bustillo’s case) a state, procedural default rule. Those different kinds of rules are treated differently under the Supremacy Clause. See ibid, (applying the rule that “ ‘an Act of Congress ... is on a full parity with a treaty, and .. . when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null’ ”). Contrary to Justice Ginsburg’s view, then, ante, at 363 (opinion concurring in judgment), there is no anomaly in treating state law differently from federal law for these purposes, if Congress chooses to enact legislation binding only the Federal Government in respect to a matter covered by a treaty that binds both the Federal Government and the States. Therefore, reading the Convention to require the state courts to set aside Virginia’s procedural default rule in Bustillo’s case (assuming for argument’s sake that his case meets the criteria I have described, see supra, at 379) would not call into question, let alone overrule, “Breará’s plain holding that the Convention does not trump the [federal] procedural default doctrine,” ante, at 353, n. 4 (opinion of the Court), even if that ruling on its own terms is still good law after Avena and LaGrand.
Moreover, the ICJ decided Avena and LaGrand after this Court decided Breará. And it is not difficult to reconcile those cases with Breará because they do not directly conflict with Breará’s result. Rather, they interpret Article 36(2) to require state procedural default rules sometimes to give way to the Convention, namely, when those rules prevent effective remedy by barring assertion of a claim because of a delay caused by the Convention violation itself. I would read Breará as consistent with this interpretation, i. e., as not saying that the Convention never trumps any procedural default rule.
The Court complains that this treatment of Breará fails to give our own opinions “‘respectful consideration.’” Ante, at 353, n. 4. In fact, our opinions are entitled to far more *390 than respectful consideration; they are entitled to full stare decisis effect. But, as I have explained, reading Breará not to decide the outcome in this case would neither overrule Breará’s holding, nor reject outright its reading of the Convention. And, in any event, as a matter of the law of stare decisis, a modified reading of Breará is appropriate in light of the fact that the ICJ’s later decisions amount to a “significant... subsequent development” of the law sufficient to lead to a reconsideration of past precedent. Agostini v. Felton, 521 U. S. 203, 236 (1997); United States v. Percheman, 7 Pet. 51 (1833) (revisiting prior treaty interpretation when new international law has come to light); see also Medellin, 544 U. S., at 689 (O’Connor, J., dissenting) (“In the past the Court has revisited its interpretation of a treaty when new international law has come to light” (citing Percheman, supra, at 89)). Indeed, the Court seems to recognize as much, in that it spends several pages explaining why the ICJ’s interpretation of the Convention is incorrect, see ante, at 356-357, rather than simply rejecting Bustillo’s argument on the ground that “ ‘respectful consideration’ of precedent should begin at home,” ante, at 353, n. 4.
And there are other reasons not to place too much reliance on the breadth of Breará’s language. Breará is a per curiam decision that the Court had to reach within the few hours available between the time a petition for certiorari was filed and a scheduled execution, the decision is fairly recent, and the modification to which I refer requires no more than reading an exception into Breará’s language, language that in any event was not central to the Court’s holding.
The modification is appropriate too because the “full effect” proviso in Article 36(2) provides a “clear and express statement” that sometimes the Convention might trump a domestic procedural rule. And in any event, it is not even clear that such a clear statement rule actually exists. Breará’s statement of a presumption that only a treaty pro *391 vision with a “clear and express statement” can trump “the procedural rules of the forum State,” 523 U. S., at 375, is in tension with more fundamental interpretive rules in this area. See, e. g., Jordan v. Toshiro, 278 U. S. 123, 127 (1928) (treaties must be construed liberally to protect substantial rights); Asakura, 265 U. S., at 342 (same); see also Vienna Convention on the Law of Treaties, opened for signature May 23, 1969, Art. 27, 1115 U. N. T. S. 331, T. S. No. 58 (1980), 8 I. L. M. 679 (1969) (treaty parties may not invoke domestic law as an excuse for failing to conform to their treaty obligations).
Indeed, the cases Breard cites for the proposition that a clear and express statement is required to trump a domestic procedural rule seem not to establish it. Sun Oil Co. v. Workman, 486 U. S. 717, 723 (1988) (Court said only that it was a “rule in international law at the time the Constitution was adopted” that procedural rules “may be governed by forum law even when the substance of the claim must be governed by another State’s law”; case involved domestic law and the Constitution’s Full Faith and Credit Clause); Le Roy v. Crowninshield, 15 F. Cas. 362, 365, 371 (No. 8,269) (Mass. 1820) (case involved conflict of laws, not an international treaty); Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U. S. 694, 700 (1988) (case said that “we almost necessarily must refer to the internal law of the forum state” to find a service of process standard if a treaty “does not prescribe” it); Société Nationale Industrielle Aérospatiale v. United States Dist. Court for Southern Dist. of Iowa, 482 U. S. 522, 539-540, and n. 25 (1987) (case involving a specific treaty, not a general interpretive standard).
Finally, the Court says it would be odd to treat Convention rights more favorably than rights protected by the U. S. Constitution. Ante, at 358-360. But “[a] treaty is in its nature a contract between two nations,” Foster, 2 Pet., at 314, and nations are of course free to agree to grant one another’s *392 citizens protections that differ from the protections enjoyed by citizens at home, particularly when circumstances call for differential treatment. See infra, at 394.
In sum, I find strong reasons for interpreting the Convention as sometimes prohibiting a state court from applying its ordinarily procedural default rule to a Convention violation claim. The fact that the IC J reached a similar conclusion in LaGrand and Avena adds strength to those reasons. And I cannot agree with the majority’s arguments to the contrary.
Consequently, I would remand No. 05-51 so that Bustillo can argue to the Virginia state courts that they should modify their ordinary procedural default requirements. I would leave it to the state courts to determine in the first instance whether state law has provided Bustillo the effective remedy that the Convention requires and how it has done so (whether through “cause and prejudice” exceptions, ineffective-assistance-of-counsel claims, or other ways). Cf. LaGrand, 2001 I. C. J., at 513, ¶ 125 (the “choice of [implementing] means must be left to the United States”).
IV
The final question presented asks whether a Convention violation “result[s] in the suppression” of the evidence, say, a confession, that a foreign national provided police before being informed of his Convention rights. Pet. for Cert, in No. 04-10566, p. i. The majority answers in absolute terms, stating that “suppression is not an appropriate remedy for a violation of [the Convention].” See ante, at 337. I agree with the majority insofar as it rejects the argument that the Convention creates a Miranda-style “automatic exclusionary rule.” Ante, at 344; see also Miranda, 384 U. S., at 471; cf., e. g., Mapp v. Ohio, 367 U. S. 643 (1961); Franks v. Delaware, 438 U. S. 154 (1978). But I do not agree with the absolute nature of its statement. Rather, sometimes suppression could prove the only effective remedy. And, if that is so, then the Convention, which insists upon effective remedies, *393 would require suppression in an appropriate case. Art. 36(2), 21 U. S. T., at 101.
Much depends upon the circumstances. It may be true that in “most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police.” Ante, at 349. Miranda surely helps, for it guarantees that police will inform an arrested foreign national of his right to contact a lawyer. But one cannot guarantee in advance that Miranda will adequately cure every seriously prejudicial failure to inform an arrested person of his right to contact his consular post. One can imagine a case, for example, involving a foreign national who speaks little English, who comes from a country where confessions made to the police cannot be used in court as evidence, who does not understand that a state-provided lawyer can provide him crucial assistance in an interrogation, and whose native community has great fear of police abuse. Indeed, Sanchez-Llamas made allegations similar to these in his case. Brief for Petitioner Sanchez-Llamas 5-7; see also Brief for the Government of the United Mexican States as Amicus Curiae 10.
While Justice Ginsburg is correct that a defendant who is prejudiced under the Convention may be able to show that his confession is involuntary under Miranda, ante, at 361, I am not persuaded that this will always be so. A person who fully understands his Miranda rights but does not fully understand the implications of these rights for our legal system may or may not be able to show that his confession was involuntary under Miranda, but he will certainly have a claim under the Vienna Convention. In such a case, suppression of a confession may prove the only effective remedy. I would not rule out the existence of such cases in advance.
Furthermore, the majority is wrong to say that it would “be startling if the Convention were read to require suppression” in such cases because suppression “is an entirely American legal creation.” Ante, at 343. I put to the side the fact *394 that “suppression” is in origin a British, not an American, remedy. See Dickerson v. United States, 530 U. S. 428, 433 (2000) (noting that “[t]he roots of the [Miranda] test developed in the common law” and citing English cases); see also King v. Warickshall, 1 Leach 263, 263-264, 168 Eng. Rep. 234, 235 (1783) (coerced confessions are inadmissible in British courts). Regardless, it is not “startling” to read the Convention as sometimes requiring suppression. That is because those who wrote the Convention were fully aware that the criminal justice systems of different nations differ in important ways. They did not list particular remedies. They used general language. That language requires every member nation to give “full effect” to Article 36(l)’s “purposes.” Art. 36(2), 21 U. S. T., at 101. That language leaves it up to each nation to determine how to implement Article 36(l)’s requirements. Avena, 2004 I. C. J., at 61, ¶ 127; LaGrand, supra, at 513-514, ¶ 125. But as a matter of logic and purpose that language must also insist upon the use of suppression if and when there are circumstances in which suppression provides the only effective remedy.
These differences may also help to explain what the majority says is the disturbing circumstance that “nearly all” other signatories to the Convention “refuse to recognize” suppression “as a matter of domestic law,” and therefore that “Sanchez-Llamas would [not] be afforded the relief he seeks here in any of the other 169 countries party to the Vienna Convention.” Ante, at 344. In fact, there are several cases from common-law jurisdictions suggesting that suppression is an appropriate remedy for a Convention violation. See, e. g., Tan Seng Kiah v. Queen (2001) 160 F. L. R. 26 (Crim. App. N. Terr.) (Australian case suppressing confession obtained in violation of statute requiring police to notify defendant of right to contact consulate upon arrest); Queen v. Tan [2001] W. A. S. C. 275 (Sup. Ct. W. Aus. in Crim.) (Australian case considering but declining to suppress evidence based on violation of same statute); Queen v. Partak, 160 *395 C. C. C. 3d, at ¶ 63 (Canada) (concluding that suppression is inappropriate, not because it was never a proper remedy under the Vienna Convention but because the defendant “completely failed to demonstrate any prejudice arising from the failure of the police to notify him of his consular rights”).
I concede the absence of such cases from civil-law jurisdictions. But the criminal justice systems in those nations differ from our own in significant ways. Civil-law nations, for example, typically rely more heavily than do we upon judicial investigation, questioning by a neutral magistrate, the compiling of all evidence into a dossier, and later review of that dossier at trial by judges who may sit without our type of jury. In such a system, formal suppression proceedings may prove less frequent. Judges, as a matter of practice, may simply disregard improperly obtained evidence, they may discount the significance of that evidence, or they may adjust the nature of future proceedings or even the final sentence accordingly. See Damaska, Evidentiary Barriers to Conviction and Two Models of Criminal Procedure: A Comparative Study, 121 U. Pa. L. Rev. 506, 522 (1972) (explaining why many civil law system “provisions regulating the interrogation of defendants are silent as to the admissibility of testimony obtained in violation of proper interrogation procedures”); see also Van Kessel, European Perspectives on the Accused as a Source of Testimonial Evidence, 100 W. Va. L. Rev. 799, 831 (1997) (“Because [civil-law] courts decide both questions of law and of fact, exclusionary rules in [those] courts are more appropriately described as rules of decision than rules of exclusion—what evidence the fact-finder may use to support its decision, rather than what evidence may be presented to the fact-finder. The presiding judge is well acquainted with all evidence in the dossier and often must 'put aside’ or 'forget about’ evidence which legally cannot be used to support the judgment”); Bradley, The Exclusionary Rule in Germany, 96 Harv. L. Rev. 1032, 1065 (1982) (noting that in the German inquisitorial system, for *396 many police violations, “the fact that evidence was legally or illegally obtained is not dispositive”; instead, the “decision to admit or suppress will be determined by balancing the relative importance of the defendant’s privacy rights against the seriousness of the offense charged”); Declaration of Professor Thomas Weigend, Annex 3 to Counter-Memorial of the United States, in Avena, 2004 I. C. J. No. 128, p. A367, ¶ 20 (Oct. 22, 2003) (noting that in the German and Dutch legal systems, a procedural violation can lead to a reduced sentence).
Thus, the absence of reported decisions formally suppressing confessions obtained in violation of the Convention tells us nothing at all about whether such nations give “full effect” to the “purposes” of Article 36(1). The existence of cases in such nations where a court denies a defense request to suppress, of course, might well shed light on that nation’s readiness to provide an effective remedy. The Solicitor General cites one (and only one) such case. See Judgment of Nov. 7, 2001, 5 BGHSt 116 (deciding in light of LaGrand that the Convention creates individual rights, but declining to suppress confession). That is the only support I have found for the claim that somehow the petitioners here are asking the United States to provide that which other countries deny, an effective remedy.
V
The United States joined the Vienna Convention, and urged other nations to join, in order to promote “the orderly and effective conduct of consular relations between States,” and to guarantee “the protection of our citizens abroad.” Vienna Convention on Consular Relations with Optional Protocol, S. Exec. Doe. No. E, 91st Cong., 1st Sess., 60, 75 (1969). In doing so, the United States, along with the other 169 nations that ratified the Convention, undertook a complex task. They sought not only to protect their consular posts, but also to assure that their nationals would have access to those posts when arrested abroad. But how to enforce those *397 rights poses a difficult question because the enforcement mechanism inevitably will vary depending upon the details of a nation’s legal system. For practical, legal, and political reasons, it is difficult to write enforcement details into an international treaty. Yet without any such guarantees it may prove difficult to prevent an individual nation, through application of its system’s details, from denying in practice the rights that the treaty sought to assure.
The Convention deals with this problem by including a general provision that both severely limits the treaty’s intrusion into the functioning of a domestic legal system and also safeguards consular access rights from serious domestic neglect. It does so by stating that those rights shall “be exercised in conformity with the laws and regulations of the receiving State,” provided that those laws and regulations give “full effect” to Article 36(l)’s purposes. Art. 36(2), 21 U. S. T, at 101.
Applying this provision to our own legal system, I would seek to minimize the Convention’s intrusion and federal intrusion into the workings of state legal systems while simultaneously keeping faith with the Convention’s basic objectives. That is why I believe that the Convention here requires individual States to make an exception (akin to a “cause and prejudice” exception) to a state procedural default rule if (1) the defendant’s failure to raise a claim of a Convention violation in a timely manner itself was a product of that violation, and (2) state law provides no other procedural means through which the State’s courts can provide “review,” “reconsideration,” and effective relief. Similarly, I would hold that whether the Convention requires a state court to suppress a confession obtained after an Article 36 violation depends on whether suppression is the only remedy available that will effectively cure related prejudice. And because neither state court applied this standard below, I would remand each case for that initial consideration. See 338 Ore., at 269, 108 P. 3d, at 574 (rejecting Sanchez-Llamas’ *398 request for suppression remedy solely on the ground that the Convention “does not create rights that individual foreign nationals may assert in a criminal proceeding”); App. to Pet. for Cert. 47a (rejecting Bustillo’s request for state postconviction relief based on a standard different from that set forth here).
The interpretation of the Convention that I would adopt is consistent with the ICJ’s own interpretation and should not impose significant new burdens upon state criminal justice systems. America’s legal traditions have long included detailed rules for discovering and curing prejudicial legal errors. Indeed, many States already have “cause and prejudice” exceptions likely broad enough to provide the “effective” relief the Convention demands. And, in any event, it leaves the States free to apply their own judicial remedies in light of, and bounded by, the Convention’s general instructions.
The Court, I fear, does not rise to the interpretive challenge. Rather than seek to apply Article 36’s language and purposes to the federal-state relationships that characterize America’s legal system, it simply rejects the notion that Article 36(2) sets forth any relevant requirement. That approach leaves States free to deny effective relief for Convention violations, despite America’s promise to provide just such relief. That approach risks weakening respect abroad for the rights of foreign nationals, a respect that America, in 1969, sought to make effective throughout the world. And it increases the difficulties faced by the United States and other nations who would, through binding treaties, strengthen the role that law can play in assuring all citizens, including American citizens, fair treatment throughout the world.
Accordingly, I respectfully dissent.

 Before trial, Sanchez-Llamas moved to suppress his statements to police on voluntariness grounds. The trial court denied the motion, finding that clear and convincing evidence established Sanchez-Llamas’ knowing, voluntary, and intelligent waiver of his Miranda rights. Tr. 232 (Nov. 16, 2000); App. to Pet. for Cert. in No. 04-10566, pp. 10-11. Neither the Oregon Court of Appeals nor the Oregon Supreme Court addressed Sanchez- *362 Llamas’ voluntariness challenge, and this Court declined to review the question.

 See Declaration of Ambassador Maura A. Harty, Annex 4 to Counter-Memorial of the United States in Case Concerning Avena and other Mexican Nationals (Mex. v. U. S.), 2004 I. C. J. No. 128, pp. A385-A386, ¶¶ 34-38 (Oct. 25, 2003) (observing that some Convention signatories do not permit consular access until after the detainee has been questioned, and that, even in countries that permit immediate consular access, access often does not occur until after interrogation); cf. Avena, 2004 I. C. J., at 49, ¶ 87 (recognizing that Article 36(l)(b)’s requirement that authorities “ ‘inform the person concerned without delay of his rights’ cannot be interpreted to signify that the provision of such information must necessarily precede any interrogation, so that the commencement of interrogation before the information is given would be a breach of Article 36”).

 Furthermore, once Bustillo became aware of his Vienna Convention rights, nothing prevented him from raising an ineffeetive-assistance-ofcounsel claim predicated on his trial counsel’s failure to assert the State’s violation of those rights. Through such a claim, as the dissent acknowledges, see post, at 379, 382, 388, 392, “full effect” could have been given to Article 36, without dishonoring state procedural rules that are compatible with due process. Bustillo did not include a Vienna-Convention-based, ineffective-assistance-of-eounsel claim along with his direct Vienna Convention claim in his initial habeas petition. He later sought to amend his petition to add an ineffective-assistance-of-counsel claim, but the court held that the amendment did not relate back to the initial pleading. Tr. of Oral Arg. 26,42. The state court therefore rejected Bustillo’s ineffectiveness claim as barred by the applicable state statute of limitations. App. 132. Bustillo did not seek review of that decision in this Court.